CENTURY 21 REAL ESTATE CORPO-
RATION and Century 21 South Central
States, Inc., Appellants,

v.

HOMETOWN REAL ESTATE COM-
PANY, D/B/A Century 21 Home-
town Real Estate, Appellee.

No. 06–94–00022–CV.

Court of Appeals of Texas,
Texarkana.

Argued Oct. 28, 1994.

Decided Nov. 7, 1994.

Rehearing Overruled Dec. 6, 1994.

W. Wendell Hall, Fulbright & Jaworski, San Antonio, Larry Powers, Powers & Blount, Sulphur Springs, William C. Meier, Meier & Parker, Bedford, Renee A. Forinash, Fulbright & Jaworski, San Antonio, for appellants Century 21 Real Estate Corp. & Century 21 South Cent. States, Inc.

W.T. Allison, II, Sulphur Springs, for appellee Hometown Real Estate Co., d/b/a Century 21 Hometown Real Estate.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

OPINION

BLEIL, Justice.

Century 21 Real Estate Corporation and Century 21 South Central States, Inc. appeal from an adverse jury verdict in this suit brought under the Deceptive Trade Practices–Consumer Protection Act (DTPA). *See* Tex.Bus. & Com.Code Ann. §§ 17.41, et seq. (Vernon 1987 & Supp.1994). The critical issues on appeal are whether the appellants were sellers of goods or services and the sufficiency of the evidence to support the jury's findings that the defendants violated the DTPA and did so knowingly. Other issues are whether the trial court erred in denying the motion to strike the jury panel and whether the trial court erred in refusing to require Hometown Real Estate Company to designate only one representative to be present at trial after the rule was invoked. We find no reversible error and find no evidence to support the finding of a knowing DTPA violation; we therefore modify the judgment to delete the recovery of additional damages and otherwise affirm the judgment.

In 1967, Tim Kelty and Gene Watson opened an independent real estate agency in Sulphur Springs, Texas. In 1980, Kelty and Watson purchased a Century 21 franchise from Century 21 South Central States' predecessor and renamed their business "Century 21 Hometown Real Estate." South Central is a wholly owned subsidiary of Century 21 Real Estate Corporation (International). Kelty purchased Watson's share of the business in 1984, and later Scott Burgin and Mike Tyler each purchased 22½% of Hometown's stock. Kelty is the president, Tyler is the vice-president, and Burgin is the secretary of the company.

Hometown was a successful Century 21 franchise and received an achievement award at a 1986 ceremony. Kelty testified that, at this ceremony, he talked to Richard Loughlin, the chief executive officer of International, who confirmed that International had an unwritten policy of not placing a second franchise in an area served by an existing franchise that has garnered 30–40% of the market.[1] Loughlin does not recall meeting or talking with Kelty at the awards ceremony.

In 1991, Hometown began the process of renewing its franchise agreement just as it had in 1984 and 1987. South Central sent Hometown a disclosure statement as required by federal law. *See* 16 C.F.R. § 436.1 (1992) (disclosure requirements promulgated by the Federal Trade Commission). The disclosure statement is prepared and reviewed by International for use by South Central and informs the reader that the franchise agreement does not grant an exclusive territory to the franchisee. The unwritten 30% rule is not in the disclosure statement.

International and South Central acknowledge that the 30% rule was a company marketing policy. Kelty testified that no one indicated that South Central or International did not intend to adhere to the policy. South Central officers and managers told Kelty that no letter agreement providing a protected territory was available. In fact, such a letter agreement, signed by the president of South Central, was issued in March 1992 to Jerry Anderson, who purchased a Century 21 franchise in Frisco, Texas. South Central's 1992 business plan indicated that the company intended to close 117 marketing areas and enter into written understandings with the franchisees in these protected markets; the company later abandoned this plan. South Central's president, David Jenks, testified that between 3 and 6 other franchises, out of 560 franchises, have arrangements similar to Anderson's. Kelty and Tyler testified that if the availability of a letter agreement had been made known to Hometown, then Hometown would not have renewed its franchise agreement until it obtained such a letter to protect its business.

Hometown executed a new franchise agreement in early 1992 and paid a $100.00 renewal fee. That agreement, which expires in 1997, expressly provides that the franchi-

1. This rule is referred to as both a 30% rule and a 30–40% rule in the statement of facts. For clarity's sake, we hereafter refer to it as the 30% rule.

see is not given any territorial rights or a protected area.

In April 1992, soon after Hometown renewed its franchise arrangement, South Central was contacted by Lowell Cable, who was interested in opening another Century 21 franchise in Sulphur Springs. South Central investigated the real estate market in the Sulphur Springs area and determined that Hometown had a 9–18% share of the available market. South Central granted the second Century 21 franchise to Cable.

Hometown sued International and South Central in September 1992, alleging that they had violated the DTPA. The jury found that both International and South Central engaged in an unconscionable course of action and failed to disclose material information about the 1992 franchise agreement. The jury also found that South Central had misrepresented the terms of the franchise agreement. The jury awarded actual damages totaling $337,900.00. The jury found that International and South Central had knowingly engaged in the wrongful conduct and awarded additional damages in the amount of $150,000.00 against International and $350,000.00 against South Central.

## DTPA CLAIMS

South Central and International contend that Century 21 was not a seller of goods or services to Hometown. South Central and International claim that this issue was preserved below in a motion for judgment notwithstanding the verdict. That motion is on behalf of International alone. South Central did not present this claim to the trial court for its consideration and therefore has not preserved this argument for appeal. Tex.R.App.P. 52(a); *see also* Tex. R.Civ.P. 301.

International filed a motion for judgment notwithstanding the verdict, asserting that there was no evidence to establish that it was a seller of goods or services to Hometown, which appears to be an assertion relating to International's lack of sufficient contact with Hometown to make International liable under the DTPA. Tex. R.Civ.P. 301; *see also Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705, 707 (Tex.1983) (holding that privity between plaintiff and defendant not required when deciding consumer status under DTPA, and plaintiff is consumer as to all parties who seek to enjoy benefit of transaction). On appeal, International attacks Hometown's status as a consumer for purposes of this particular suit, contending that any goods or services Hometown acquired as part of its franchise arrangement are not the basis of its complaint.[2] Complaints and argument on appeal must correspond with the complaint made at the trial court level. *See* Tex. R.App.P. 52(a); *Borden, Inc. v. Guerra*, 860 S.W.2d 515, 525 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.); *Pfeffer v. Southern Texas Laborers' Pension Trust Fund*, 679 S.W.2d 691, 693 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). International's complaint, that any goods or services acquired by Hometown are not the basis of its complaint, was never presented to the trial court and is thus not preserved.[3]

International and South Central challenge the legal and factual sufficiency of the evidence to support the jury's findings that they violated the DTPA. When reviewing a no evidence point, the appellate court considers only the evidence and inferences that support the challenged finding and disregards all evidence and inferences to the contrary. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992). If there is any evidence of probative force to support

**2.** The question whether a complaining party is a consumer is a question of law for the court, and if the plaintiff is not a consumer, the court will not submit issues to the jury as to violations of the DTPA. *Security Bank v. Dalton*, 803 S.W.2d 443, 451 (Tex.App.—Fort Worth 1991, writ denied). A plaintiff must meet two tests to qualify as a consumer: (1) the person must have sought or acquired goods or services by purchase or lease, and (2) the goods or services purchased or

leased must form the basis of the complaint. Tex.Bus. & Com.Code Ann. § 17.45(4) (Vernon 1987); *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 352 (Tex.1987).

**3.** The first mention of this complaint is found in the appellants' amended brief filed in this court on the day of oral argument.

the finding, the no evidence point is overruled. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). If the no evidence point is overruled, the appellate court next considers, weighs, and examines all of the relevant evidence. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex.1989). The finding is set aside only if it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175 (Tex.1986).

■ The jury found that South Central had misrepresented the 1992 renewal agreement. False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are unlawful and actionable under the DTPA. *See* TEX.BUS. & COM.CODE ANN. § 17.46(a) (Vernon 1987). Included in the statutory laundry list of acts considered to be false, misleading, or deceptive is a prohibition against representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve. *See* TEX.BUS. & COM.CODE ANN. § 17.46(b)(12) (Vernon Supp.1994).

■ To be actionable under section 17.46(b)(12), statements alleged to be false, misleading, or deceptive must represent a person's rights, remedies, or obligations under the terms of the contract itself. *See St. Paul Oil and Gas Corp. v. Trijon Exploration, Inc.*, 872 S.W.2d 27, 29 (Tex.App.—Corpus Christi 1994, writ denied); *Home Sav. Ass'n Serv. Corp. v. Martinez*, 788 S.W.2d 52, 56–57 (Tex.App.—San Antonio 1990, writ denied). To quote from Hometown's brief: "The franchise renewal agreement provides that the franchisee is not granted an exclusive area." There is no debate about what the express terms of the agreement are or were represented to be. The basis for this suit is the unwritten policy, independent of the terms in the written agreement, that another franchise would not

be placed in a franchisee's area if it had garnered at least a 30% market share. There is no evidence that this market share rule was represented to be a right that Hometown had under the terms of its agreement. International's and South Central's complaint that there is no evidence to support the jury's finding that South Central misrepresented the terms of the franchise agreement is well taken.

■ The jury found that both South Central and International, at the time of the renewal of the franchise, had failed to disclose material information about the franchise agreement with the intention of inducing Hometown into renewing the franchise, which Hometown would not have done had the information been disclosed. Nondisclosure of material facts may constitute a false, misleading, or deceptive act in violation of the DTPA. *See* TEX.BUS. & COM.CODE ANN. § 17.46(b)(23) (Vernon Supp.1994).

■ In addition, the Federal Trade Commission (FTC) has promulgated rules requiring that franchisors provide a statement to prospective franchisees disclosing specified material information. 16 C.F.R. § 436.1. Section 436.1 provides that the failure to furnish a prospective franchisee with the specified information is an unfair or deceptive act or practice within the meaning of the Federal Trade Commission Act.[4] *See id.; see also* 15 U.S.C.A. § 45(a)(1) (West Supp.1994). The DTPA applies to an act or practice prohibited by an FTC rule or regulation. TEX.BUS. & COM.CODE ANN. § 17.49(b) (Vernon 1987); *Texas Cookie Co. v. Hendricks & Peralta*, 747 S.W.2d 873, 877 (Tex. App.—Corpus Christi 1988, writ denied).

The disclosure statement does not mention the 30% rule, the existence of any closed markets, or the availability of closed market letter agreements. During a phone conver-

---

4. Section 436.1, in relevant part, provides:
 [I]t is an unfair or deceptive act or practice ... [t]o fail to furnish any prospective franchisee with the following information ...:
 ....
 (13) A statement describing the material facts of whether, by the terms of the franchise agreement or other device or practice, the franchisee is ... (iv) [g]ranted territorial protection by the franchisor, by which, with re-

spect to a territory or area, (A) the franchisor will not establish another, or more than any fixed number of, franchises.
 ....
 (15) A statement disclosing, with respect to the franchise agreement and any related agreements ... (xi) [t]he conditions under which the franchisee may modify.
16 C.F.R. § 436.1(a)(13), (15) (1992).

sation with Hometown after the decision to grant a second franchise was made, Jenks acknowledged that Century 21 had a market share policy that was not in the disclosure statements. Jerry Anderson and George Fox, a former manager at South Central, testified that the unwritten market share rule would be of material importance to a potential franchisee.

The disclosure statement does provide that any modifications to the franchise agreement must be in writing, approved by the franchisor (International), and executed by the franchisee, the subfranchisor (South Central), and the franchisor. International's lawyers prepared and reviewed the franchise agreements and disclosure statements, and International also approved the business plans for its regional companies.

South Central and International emphasize that the unwritten rule was internal marketing policy. The disclosure statement was changed in 1993 to include a paragraph on South Central's internal policies concerning the categorization of market areas based on a number of factors, including market share.

■ Mere nondisclosure of material information is not enough to establish an actionable DTPA claim. By definition, the prohibition against failing to disclose material information requires a showing of intentional misconduct. TEX.BUS. & COM.CODE ANN. § 17.46(b)(23); *Freeman v. Greenbriar Homes, Inc.*, 715 S.W.2d 394, 397 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). International and South Central must have failed to disclose the information with the intent of inducing Hometown into renewing its franchise.

■ Although the 30% rule is not in the disclosure statement, that is a policy that International and South Central readily admit having and that Hometown knew of before it renewed its franchise in 1992. The failure to disclose the 30% rule in the disclosure statement could not have induced Hometown into renewing its franchise; if anything, Hometown's knowledge of the 30% rule was a factor weighing in favor of renewal.

Hometown also knew that there were some closed areas in the region, but did not know where or how many of those areas existed. The disclosure statement included a description of how to modify the franchise agreement; nonetheless, Hometown was told by South Central that no closed area letter agreement was available, even though a letter was issued to Anderson within months of Hometown's renewal of its franchise. Conversely, it apparently was not standard practice in the region to grant a closed area to a franchise, as evidenced by the efforts expended by Jerry Anderson in procuring a closed area letter agreement for his franchise. At the time of trial, only 3 to 6 of the 560 franchises in South Central's region had closed area letter agreements, and although South Central had plans to close 117 areas, these plans subsequently were abandoned.

■ Hometown suggests, as evidence of South Central's and International's motives and intent, that South Central and International are in the business of selling franchises. It maintains that South Central wants to renew existing franchises and sell new franchises; thus, South Central and International would not want to advertise the fact that a franchisee that had cornered the real estate market in its territory could seek and obtain a letter agreement. This evidence of motive, however, amounts to no more than speculation. When evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, it is the legal equivalent of no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983).

Kelty testified that no discussions of closed areas or letter agreements occurred at the time Hometown was making its decision to renew the franchise. Kelty met with Vance Albrecht, a district manager for South Central, in January 1992 to discuss renewing the franchise. The topic of closed areas was not discussed during that meeting. The unavailability of a closed area letter agreement was known to Hometown because of past conversations with South Central agents and employees, but there were no such conversations contemporaneous with Hometown's decision to renew its franchise.

Also, Lowell Cable, who owns the second franchise in Sulphur Springs, approached South Central about obtaining a Century 21 franchise a month after Hometown renewed its franchise. South Central did not approach Cable about setting up the second franchise. There is no evidence in the record that South Central had a second franchise "in the works" at the time Hometown was making its renewal decision. Beyond speculation about Century 21's profit motive, there is no evidence to show that South Central's intent in not putting the closed market information in the disclosure statements or International's intent in approving the disclosure statements was to induce Hometown to renew its franchise without seeking a closed market agreement.

International's and South Central's complaint that insufficient evidence supports the jury's finding that they failed to disclose material information with the intentions of inducing Hometown to renew its franchise without seeking a closed market arrangement is also well taken.

■■■ International and South Central also question the sufficiency of the evidence to support the jury's determination that both International and South Central had engaged in an unconscionable action or course of action with regard to the 1992 franchise agreement. An "unconscionable action or course of action" means an act or practice that, to a person's detriment, takes advantage of the person's lack of knowledge, ability, experience, or capacity to a grossly unfair degree, or that results in a gross disparity between the value received and consideration paid, in a transaction involving the transfer of consideration. TEX.BUS. & COM.CODE ANN. § 17.45(5) (Vernon 1987). There is no scienter requirement under section 17.45(5); the determination of unconscionability is an objective standard. *Chastain v. Koonce,* 700 S.W.2d 579, 583 (Tex.1985); *see also Griffith v. Porter,* 817 S.W.2d 131, 136 (Tex.App.— Tyler 1991, no writ).

■■■ As for the gross disparity between the consideration paid and the value received, Hometown paid $100.00 to renew its franchise and of course had invested time, effort, and money in the franchise since 1980.

In return, Hometown has received and presumably will continue to receive training and the benefits of national advertising and name recognition. The term "gross" is given its ordinary meaning: glaringly noticeable, flagrant, complete, and unmitigated. *Chastain,* 700 S.W.2d at 583. Hometown must share the real estate market with another agency now, which in turn harms its profit potential, but Hometown provided no proof that there is a gross disparity between the money paid and the benefits it has received or expects to receive in the future.

■■■ The other way in which Hometown can show an unconscionable course of conduct is to show that it was taken advantage of to a grossly unfair degree. Kelty, Tyler, and Burgin are experienced realtors and businessmen. Hometown is familiar with Century 21 operations, having renewed its franchise agreement three times. Hometown did not ask for a closed market letter agreement but, as noted, Hometown was told that a letter agreement putting the market share rule into writing was not available. Hometown relied on an unwritten policy, confirmed by various representatives of South Central and the CEO of International, to protect its business.

South Central and International, while not soliciting the new franchise, did place it in Sulphur Springs after Hometown had committed itself to another five years as a Century 21 franchise. By signing the renewal agreement, Hometown surrendered any leverage it had as a successful franchise to block or otherwise resist a decision to place a second franchise in its market area. Franchisees have no input into the decision of whether another franchise will be placed in its marketing area. International and South Central approved the second franchise in Sulphur Springs after Jenks, South Central's president, decided that Hometown had garnered only 9–18% of the total real estate market in Hopkins County, the county in which Sulphur Springs is located. Hometown subsequently disputed this figure, claiming that it had about 40% of the listed real estate market in the county.

Transcribed portions of a telephone conversation that took place between Kelty, Tyler, Burgin, and Jenks soon after the approval of the second franchise were in evidence. During the conversation, Jenks admitted that Hometown had 40% of the broker business in the county and said that he may have "pulled the trigger way too fast on this one." Jenks said that if he had known that Hometown had this share of the realtor business, he would have talked with Hometown about getting more of the business that was not going through real estate companies, but that "we wouldn't have this discussion," apparently referring to the decision to approve a second franchise. We find sufficient evidence to support the finding that International and South Central, by placing a second franchise in Sulphur Springs, committed an unconscionable action.

 International and South Central contend that, if they did violate the DTPA, they did not do so knowingly. To act knowingly means to act with actual awareness of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim. Tex.Bus. & Com.Code Ann. § 17.45(9) (Vernon 1987). Actual awareness may be inferred where objective manifestations indicate that the person acted with actual awareness. *Id.* A finding that the defendants acted knowingly is a prerequisite to recovering an award of additional damages. Tex. Bus. & Com.Code Ann. § 17.50(b)(1) (Vernon Supp.1994). The jury assessed additional damages of $350,000.00 against South Central and $150,000.00 against International.

 South Central's district and sales managers had expressed a general concern about putting another franchise in Sulphur Springs—a concern communicated to Jenks before he made his decision. Carroll Bobo, South Central's franchise sales manager, was told that Hometown appeared to be number one in its market place. Jenks testified that he decided he needed to confirm for himself

what Hometown's market share was before deciding whether to grant a second franchise and at that time undertook to perform the calculations that gave Hometown a 9–18% share of the real estate market. There is evidence that, in deciding to place another franchise in the Sulphur Springs area, South Central's conclusion that Hometown had a less than desirable share of the market was the result of faulty assumptions about the real estate market in the county. The South Central officers and managers were unfamiliar with the county and had to gather their information from two local title companies because there is no multiple listing service available in Hopkins County. Jenks later acknowledged to Kelty, Tyler, and Burgin that his calculations had not correctly reflected the situation. South Central's failure to abide by the 30% policy and decision to place a second franchise in the area seems to be a mistake, not a deliberately unconscionable act. An award of additional damages cannot be premised on conduct that is inadvertent. *See Mancorp, Inc. v. Culpepper*, 781 S.W.2d 618, 625–26 (Tex.App.—Houston [1st Dist.] 1989); *rev'd on other grounds*, 802 S.W.2d 226 (Tex.1990).

International's role in the placement of the new franchise was limited to preparing the agreement and disclosure statement provided to the second franchise. Its unconscionable actions in placing a second franchise in Sulphur Springs also appear to be inadvertent rather than deliberate or done with actual awareness. There is no evidence that International acted with actual awareness of the unconscionability of placing a second franchise in Hopkins County. We conclude that no evidence supports the finding that any unconscionable act was committed knowingly.[5]

## TAINTED JURY PANEL

International and South Central contend that the trial court should have granted their

5. International also contends that there is legally and factually insufficient evidence that International is liable for any DTPA violations allegedly committed by South Central. This contention is a moot point because the jury charge inquires about the individual acts of International and South Central. While the charge includes definitions of apparent, actual, express, and implied authority, the jury was not asked to decide any questions dealing with the issues of agency law, the authority of South Central to act for International, or International's liability for acts other than its own.

motion for mistrial and motion to strike the jury panel because of the prejudicial statements of one of the venirepersons. Counsel for International and South Central asked the panel members to indicate if they had any feelings about the case. One of the venirepersons, William Woods, spoke up:

> I have something to say. I don't know why you ever set the thing up in the first place. They already had a franchise. Why would the company not approve it with them before they ever set the thing in the first place. My opinion is the case shouldn't have been a case. Y'all shouldn't be here today. They should not have anybody to come in on top of them.

Counsel for International and South Central did not object to this comment at the time it was made but, before the selected jurors were seated, asked the court to grant a mistrial or strike the panel because Woods' comment had so prejudiced the minds of the other panel members as to prevent International and South Central from obtaining a fair trial. The trial court overruled the motion, noting that Woods was so far down the list that he would not be selected, that counsel had invited the comment, and that none of the other jurors had subsequently said they were prejudiced. Counsel then asked the trial court to instruct the panel to disregard Woods' comment. The trial court agreed but suggested that such an instruction might hurt more than help. Counsel agreed to "live with" the trial court's ruling, and no instruction to disregard was given.

▮ The denial of a motion for mistrial or motion to strike the entire panel is within the sound discretion of the trial court. *See Brentwood Fin. Corp. v. Lamprecht,* 736 S.W.2d 836 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.). Besides showing an abuse of discretion, International and South Central also must show that the trial court's refusal to strike the entire panel was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP.P. 81(b)(1). Here, neither showing has been made.

After Woods spoke up, counsel for International and South Central did not ask any follow-up questions to determine the prejudi-

cial effect, if any, that Woods' comment had on the other panel members. International and South Central point to statements from a prospective juror who did not serve on the jury to show prejudice. They also suggest prejudice is shown by another prospective juror who asked what effect this lawsuit would have on the second franchise placed in Sulphur Springs, but evidence on this same issue—that the Cable franchise would remain—came in without objection at trial.

▮ The jury was given the instructions required under the rules of civil procedure, and the jury charge admonishes them to consider only the testimony given under oath and the exhibits introduced during the trial. An appellate court must assume that the jury properly followed the trial court's instructions. *Turner, Collie & Braden v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982).

## THE RULE

International and South Central contend that the trial court erred in refusing to require Hometown to designate one of its officers, Kelty, Burgin, or Tyler, as a representative and exclude the other officers and shareholders from the courtroom.

▮ After the attorneys made their opening statements, counsel for the defendants invoked Rule 614 of the Texas Rules of Civil Evidence ("the Rule"). Rule 614 is mandatory and provides for the exclusion of witnesses from the courtroom so they cannot hear the testimony of other witnesses. TEX. R.CIV.EVID. 614; TEX.R.CIV.P. 267; *Elbar, Inc. v. Claussen,* 774 S.W.2d 45, 51 (Tex. App.—Dallas 1989, writ dism'd). The rule provides exceptions for a party who is a natural person or the spouse of such a person, an officer or employee of a party that is not a natural person who is designated as that party's representative, or a person whose presence is shown to be essential. *See* TEX.R.CIV.EVID. 614; TEX.R.CIV.P. 267. The trial court erred by not requiring Hometown to designate a representative and not excluding Hometown's other officers and shareholders from the courtroom.

▮ To be reversible error, however, the trial court's error must amount to such a

denial of the complaining party's rights that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX.R.APP.P. 81(b)(1). The purpose of the Rule is to aid in the ascertainment of truth by preventing the testimony of one witness from influencing the testimony of another. *Posner v. Dallas County Child Welfare Unit,* 784 S.W.2d 585, 588 (Tex.App.—Eastland 1990, writ denied); *Elbar,* 774 S.W.2d at 51. Kelty, Tyler, and Burgin, besides their constant contact with each other because of their work, were all involved in this lawsuit from the beginning. The three men were parties to the suit until their individual claims were dismissed by summary judgment the day before the trial began. Their working relationship and affiliation with the progress of this suit indicate that allowing the three to remain in the courtroom and hear each other's testimony was not so prejudicial as to have probably caused or been reasonably calculated to cause the rendition of an improper judgment.

### DAMAGES

International and South Central challenge the legal and factual sufficiency of the evidence to support the jury's finding that their conduct caused Hometown to suffer any damages. The DTPA permits an injured consumer to recover the greatest amount of actual damages alleged and factually established to have been caused by a defendant's deceptive practice. *Kish v. Van Note,* 692 S.W.2d 463, 466 (Tex.1985). The plaintiff must produce evidence from which the jury could reasonably infer that the damages sued for have resulted from the conduct of the defendant. *McKnight v. Hill & Hill Exterminators, Inc.,* 689 S.W.2d 206, 209 (Tex.1985).

South Central and International assert that their actions could not have been the producing cause of Hometown's damages because the disclosure statement and franchise agreement informed Hometown that it did not have an exclusive territory. South Central and International also note that the franchise agreement has an integration clause establishing that the agreement "constitutes the entire and full agreement between the parties" and supersedes all prior and contemporaneous understandings and representations. South Central and International argue that Hometown thus could not have justifiably relied on the defendants' unwritten market share policy or on their failure to disclose that a closed market letter agreement was available.

The DTPA is to be liberally construed to effectuate its primary purpose: to protect consumers from deceptive business practices and to provide them with a cause of action without the numerous defenses found in common-law fraud, breach of warranty, or other contract actions. *See* TEX.BUS. & COM. CODE ANN. § 17.44 (Vernon 1987); *see also Alvarado v. Bolton,* 749 S.W.2d 47, 48 (Tex. 1988) (doctrine of merger does not defeat a DTPA action for breach of express warranty in earnest money contract); *Weitzel v. Barnes,* 691 S.W.2d 598, 599–600 (Tex.1985) (parol evidence rule does not bar oral misrepresentations that form the basis of a DTPA claim). Public policy also prevents a consumer from waiving the protection of the DTPA absent pleading and affirmative proof by a defendant that the consumer is not in a significantly disparate bargaining position. TEX.BUS. & COM.CODE ANN. § 17.42(a)(1) (Vernon Supp.1994); *First Title Co. v. Garrett,* 860 S.W.2d 74 (Tex.1993).

A consumer is not required to prove reliance as an independent element to recover under the DTPA, but reliance may be a factor in deciding whether the defendant's conduct was a producing cause of damages to the plaintiff. *First Title Co.,* 860 S.W.2d at 77–78; *Weitzel,* 691 S.W.2d at 600; *id.* at 601 (Gonzalez, J., dissenting); *see also Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96, 99 (1994). As Justice Gonzalez noted in his dissenting opinion in *Weitzel,* a misrepresentation cannot theoretically be a producing cause of injury if it was not at all relied upon. 691 S.W.2d at 602; *see also Celtic Life,* 885 S.W.2d at 100–01 (Enoch, J., concurring) (concluding that producing cause is present only if misrepresentation is not patently absurd so that reliance is reasonable).

Hometown was told that so long as it maintained a 30% market share it would not have to worry about having a second franchise placed in its marketing territory. Despite the integration clause and other contract provisions, Hometown believed that Century 21 would abide by its unwritten policy. The disclosure statements were silent on this issue and, having been told that the policy would not be put in writing, Hometown renewed its franchise without requesting or obtaining a letter agreement to protect its territory. A few months later, a second Century 21 franchise was placed in Sulphur Springs.

South Central and International note that Hometown's sales are on the increase and assert that placing a second franchise in Sulphur Springs has helped, not harmed, Hometown's business. Hometown did not dispute that it was enjoying a good business year, but attributed the increase to lower interest rates, which help the real estate market.

Other real estate brokers and agents testified that the second franchise would take away future sales from Hometown. South Central's sales manager and district manager also expressed concern about placing an additional franchise in Sulphur Springs. Hometown presented evidence that at least half of the commissions paid to the second Century 21 franchise should have gone to Hometown. Hometown's expert witness, Dale Funderbunk, an economist, testified that Hometown was damaged because of the new franchise and that the new franchise is a producing cause of future lost profits for Hometown. Scott Burgin testified about the costs associated with buying and setting up a new franchise. We find sufficient evidence to support the jury's finding that the misconduct of International and South Central was a producing cause of actual damages to Hometown.[6] The trial court's refusal to grant a mistrial was not an abuse of discretion.

We modify the trial court's judgment to delete the awards of additional damages because we conclude that no evidence supports the "knowingly" finding; otherwise, we affirm the trial court's judgment.

---

6. In a related point of error, International and South Central assert that the trial court erred in not striking the testimony of Burgin because he remained in the courtroom throughout the trial. As discussed above, the trial court's error in allowing Hometown's three shareholders to remain in the courtroom was harmless.

In addition, International and South Central did not timely object or move to strike Burgin's testimony. The first time such a complaint arises is after Hometown rested its case; therefore, any error is waived. TEX.R.APP.P. 52(a); *see also* TEX.R.CIV.EVID. 103, 104.