

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00811-CV

Randy **COLEMAN** and Jim Coleman Company,
Appellants

v.

Ralph **DEAN**,
Appellee

From the 79th Judicial District Court, Jim Wells County, Texas
Trial Court No. 11-04-49987-CV
Honorable Richard C. Terrell, Judge Presiding

Opinion by:    Sandee Bryan Marion, Chief Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Jason Pulliam, Justice

Delivered and Filed:  September 2, 2015

AFFIRMED AS MODIFIED

Appellant, Randy Coleman ("Randy"), brings a restricted appeal[1] from a post-answer

default judgment rendered against him; and appellant, Jim Coleman Company, appeals from a

judgment rendered against it following a jury trial.   Randy and Jim Coleman Company

(collectively, "appellants") raise similar issues on appeal challenging the sufficiency of the

---

[1] When a party does not participate in person or through counsel in a hearing that results in a judgment, he may be eligible for a restricted appeal.  TEX. R. APP. P. 30.  To sustain a proper restricted appeal, the filing party must prove: (1) he filed notice of the restricted appeal within six months after the judgment was signed; (2) he was a party to the underlying lawsuit; (3) he did not participate in the hearing that resulted in the judgment complained of, and did not timely file any post-judgment motions or requests for findings of fact and conclusions of law; and (4) error is apparent on the face of the record. *Alexander v. Lynda's Boutique*, 134 S.W.3d 845, 848 (Tex. 2004).

evidence in support of liability, damages, and attorney's fees; and asserting liability for any damage award should be joint and several.

## BACKGROUND

Ralph Dean ("Dean") and his wife ordered a modular house from Living Modular, LLC for a total purchase price of $63,700. Dean made a down payment of $30,000; later paid an additional $3,000; and incurred expenses of $14,659.38. The house was never delivered. Dean eventually sued Living Modular, Randy, and Jim Coleman Company. Dean alleged, among other things, that Living Modular was affiliated with, supported by, and maintained its operations at the Jim Coleman Company facility in Houston, Texas. Dean alleged Randy acted as an agent of Living Modular and Jim Coleman Company. Dean sued all three defendants for breach of contract and violations of the Texas Deceptive Trade Practices Act (the "DTPA"). All defendants answered the suit, but only Jim Coleman Company appeared for trial represented by counsel. The sole owner of Living Modular, who is not an attorney, appeared for trial. After the jury returned a verdict against Jim Coleman Company on the DTPA claim,[2] the trial court signed a Final Judgment in which it rendered a default judgment against Randy and Living Modular, and a judgment against Jim Coleman Company. In the Final Judgment, Dean was awarded $47,659.38 in economic damages; $142,978.14 as additional damages under the DTPA; and prejudgment and postjudgment interest, attorney's fees, and court costs.

Randy filed a restricted appeal and Jim Coleman Company filed a regular appeal. Living Modular did not appeal.

---

[2] The breach of contract claim against Jim Coleman Company was not submitted to the jury.

**LIABILITY**

On appeal, Randy[3] and Jim Coleman Company challenge the sufficiency of the evidence in support of findings that they knowingly engaged in several false, misleading, or deceptive acts or practices on which Dean relied to his detriment. Among the various DTPA violations, Dean alleged appellants caused confusion or misunderstanding as to (1) the source, sponsorship, approval, or certification of goods or services; and (2) the affiliation, connection, or association with, or certification by, another. *See* Tex. Bus. & Com. Code Ann. § 17.46(b)(2)-(3) (West 2011). Subsection (b)(2) deals with deception in the origin, source or endorsement of goods and services. *Cox v. State*, 448 S.W.3d 497, 505 (Tex. App.—Amarillo 2014, pet. filed); *Potere, Inc. v. Nat'l Realty Serv.*, 667 S.W.2d 252, 257 (Tex. App.—Houston [14th Dist.] 1984, no writ); *Prairie Cattle Co. v. Fletcher*, 610 S.W.2d 849, 853 (Tex. Civ. App.—Amarillo 1980, writ dism'd). Subsection (b)(3) deals with deception about a person's or entity's affiliation, connection, or association with, or certification by, another.

**A.     Standard of Review[4]**

A legal sufficiency challenge will be sustained when the record confirms either: (a) a complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving

---

[3] A post-answer default judgment is rendered when a defendant files an answer but fails to appear at trial. *See Stoner v. Thompson*, 578 S.W.2d 679, 682 (Tex. 1979). In the case of a no-answer default judgment, the defendant's failure to answer represents an admission of all facts properly set forth in the plaintiff's petition. *See Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex. 1984). By contrast, a post-answer "default" is not an implied confession of any issues raised by the defendant's answer. *See Stoner*, 578 S.W.2d at 682. Unlike a no-answer default, a post-answer default judgment requires the plaintiff to offer evidence to prove the factual allegations of his petition just as in a contested trial. *See id.*; *Karl & Kelly Co. v. McLerran*, 646 S.W.2d 174, 175 (Tex. 1983). Therefore, in his restricted appeal, Randy may challenge the sufficiency of the evidence and, thereby, establish error on the face of the record. *Norman Commc'n v. Texas Eastman Co.*, 955 S.W.2d 269, 270 (Tex. 1997) (recognizing review of legal and factual sufficiency claims is permissible when a post-answer default judgment is challenged by restricted appeal).

[4] On appeal, appellants state the evidence is legally and factually insufficient. However, neither appellant filed a motion for new trial complaining of factual insufficiency in support of liability. Because a motion for new trial is a prerequisite to a factual sufficiency challenge, appellants waived their right to complain about the factual sufficiency of the evidence to support the liability findings. *See* Tex. R. Civ. P. 324(b)(2)-(3). Also, the standard of review on

weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014); *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). In a legal sufficiency review, we must view the evidence in the light most favorable to the verdict. *Ford Motor Co.*, 444 S.W.3d at 620; *City of Keller*, 168 S.W.3d at 822. When reviewing all of the evidence in a light favorable to the verdict, "courts must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal sufficiency review." *City of Keller*, 168 S.W.3d at 821. When reviewing circumstantial evidence that favors the verdict, we must "view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances." *Id.* at 813-14. If circumstantial evidence, when viewed in light of all the known circumstances, is equally consistent with either of two facts, then neither fact may be inferred. *Id.* But where the circumstantial evidence is not equally consistent with either of two facts, and the inference drawn by the jury is within the "zone of reasonable disagreement," a reviewing court cannot substitute its judgment for that of the trier-of-fact. *Id.* at 822.

**B.** **The Evidence**

Dean was the only witness to testify on liability, and the following is taken from his testimony.[5] In August 2009, Dean and his wife attended a Texas Trophy Hunter's Extravaganza in Houston, Texas, when they passed by a Living Modular booth. Dean said the booth advertised concrete houses for sale, and he and his wife wanted one for their property in Premont, Texas to

---

which appellants rely and their substantive argument is that the evidence is legally insufficient; therefore, it appears they assert only a legal sufficiency challenge. In any event, we review the evidence only for legal sufficiency.

[5] Dean called two other witnesses to testify about attorney's fees. The Jim Coleman Company called no witness and submitted no documentary evidence because the trial court struck any witness the defendants might call on the grounds that they failed to answer discovery.

use as a recreational house. The couple hoped to have the house built by Thanksgiving 2009. At the booth, the couple met the brothers, Wayne and Randy Coleman, and another man by the name of Bob Oaks.

Dean believed Oaks was an employee of Jim Coleman Company helping with sales of the modular houses. Randy handed Dean a business card and told Dean that both he and Wayne were executives with Jim Coleman Company. The card Randy gave Dean read "Jim Coleman Company . . . World Class Manufacturing of Car Wash Equipment." Before the hunting show, Dean knew nothing about modular houses, but while at the show, he learned they were manufactured in Mexico, they could be made quickly, and they appeared extremely durable. He also learned models of the houses were on Jim Coleman Company's property in Houston, and that any subsequent meetings about purchasing a house would be held at that location.

Dean and his wife later decided to go to Houston to see the models. The couple met with Randy, Wayne, and Oaks, who "started the sales pitch" and reviewed sales brochures. One of the brochures showed an L-shaped house, but Dean and his wife wanted a T-shaped house. Dean said they were told they could design their house, and a draftsman used Jim Coleman Company's AutoCAD to draw up a computer-generated blueprint of the house. Dean said Randy told him that they could do anything with the houses, including putting two together to make one larger house. Randy told the couple that not only could he "tweak" the design, there were "craftsman [sic] in his employ in Mexico or people that he could get that could also tweak the interior and not go with the standard list that was on the right [side of the sales brochure]; that he could upgrade the interiors and [the] sky was the limit is what he told me."

Dean said the Coleman brothers were originally going to do the site preparation, but because they could not find anyone to do the work, Dean himself purchased caliche and hired a man to level the site to the necessary specifications. The couple was told the house would have

various amenities, including a kitchen area, a bathroom with tiled shower and toilet, and paint-textured interior and exterior walls. The purchase price also included transportation and road permits from Monterrey, Mexico to the job site. Dean was told the manufacturing facility was located in Mexico "and that's where it was going to come from and they would take care of that in no time." Dean said he specifically asked about any problems with delivery from Mexico, and was told there were no problems. He said if he had been told there were problems, he would not have paid for the house.

Dean and his wife did not make any decision after the first meeting, but went back to the Jim Coleman Company offices several times. At either the first or second meeting, they walked through the Jim Coleman Company facility, the manufacturing area of the car wash business, and Randy's and Wayne's offices. Dean said Oaks had an office at Jim Coleman Company, but he did not know what position he held with the company. The couple was told that as part of Jim Coleman Company's manufacturing of car washes, the company could build awnings or covered front porches for whatever modular house they purchased. When asked whether the couple was told, during a tour of the facilities, that Jim Coleman Company did not have anything to do with the manufacture of modular houses, Dean replied "no" and that he was "led to believe there was like a subsidiary of the Jim Coleman Company; like it was one and the same." He thought Living Modular and Jim Coleman Company were the same company, but "different wings." Dean thought he was dealing with a well-established national company that "was affiliated with — you know, it was all one big, happy family: Coleman, Coleman and Coleman."

The couple eventually decided to buy a modular house, and, on October 22, 2009, signed an order form and made a $30,000 down payment. The order form was drawn up by Oaks, who told the couple he worked for Jim Coleman Company. After the couple agreed to buy the house and "tweaked" the design, they were given the blueprint of their house as prepared by the Jim

Coleman Company employee. The check for $30,000 was made payable to Living Modular. After they received the blueprint and made certain upgrades to the house's interior, the couple paid an additional $3,000 with a check payable to Randy on November 3, 2009.

The couple anticipated delivery of the house before Thanksgiving 2009. Dean said he asked several times about any potentials delays because the house was coming from Mexico, and Randy and Wayne told him "it was smooth as silk." Randy and Wayne made several visits to the couple's property to ensure the site was adequate for the house and there was clearance for the cranes. In addition to the $33,000 paid, Dean also made an $8,000 direct deposit to what he believed was Randy's account to cover the extra cost of expanding the house, plus an additional $6,659.38 to prepare the site and to purchase materials that were to be put on the building "where it sat in Mexico that were going to build it up."

Dean said he was given different reasons for why delivery was delayed, including that Randy, Wayne, and Oaks said they intended to move the plant from Mexico to Texas. When Christmas 2009 came and went with no delivery of the house and no one returning his telephone calls, Dean went to the Jim Coleman Company offices in Houston, but he was told Oaks, Randy, and Wayne were not there.

On direct examination, Dean identified Exhibit 4 as an aerial photograph of the Jim Coleman Company property, and Exhibit 3 as "the gate to the Living Modular area of the Jim Coleman Company." Exhibit 3 showed a sign that read "Living Modular, 3450 Antoine" on the fence next to the gate through which Dean entered the property. Both exhibits were admitted into evidence. On cross-examination, Dean admitted the aerial view of the property showed more than just the Jim Coleman Company facility. For example, it showed a convenience store and possibly a hotel. Dean said the first few times he went to Living Modular in Houston, he entered from Antoine Street. Dean agreed Jim Coleman Company's address was on West 34th Street, which

runs perpendicular to Antoine Street. Dean agreed Living Modular occupied the area off Antoine Street and there were four concrete buildings; two were Living Modular offices and two were model houses. Dean acknowledged the brochures listed telephones numbers for Wayne and Randy, but he said he usually called Randy on his cell phone and he used the Jim Coleman Company switchboard to call Oaks. When asked if he had anything with Jim Coleman Company's name on it stating it sponsored Living Modular, Dean replied, "It was [everywhere] that I was at when I was visiting them at their office. I was at the Jim Coleman Company. I was — it was all implied [by Randy] and Wayne and Bob Oaks."

Dean testified he was never told his house was complete and ready to ship, and he was only shown photos of components that were to be part of the house. Dean said Randy, Wayne, and Oaks misled him "about their abilities to produce the product," he was misled about Jim Coleman Company's involvement, and he did not know Living Modular was a company separate from Jim Coleman Company. When asked why he thought the companies would have separate entrances and there was no mention of Jim Coleman Company in the literature, Dean responded

> I came in several times through the Jim Coleman property, to their office complex, and no one ever told me there was a difference between the two. They made it seem, verbally and with cards and AutoCADs and introductions to their facility, made it known that they were one and the same.

Dean said he was led to believe Living Modular was affiliated with Jim Coleman Company.

## C.     DTPA: Confusion or Misunderstanding

The evidence here shows that, while working in the Living Modular booth at the hunting show, Randy handed Dean his Jim Coleman Company business card. Randy, Wayne, and Oaks were all identified as employees of Jim Coleman Company. While in Houston for further meetings about the modular house, Dean and his wife were taken through the Jim Coleman Company facilities. A Jim Coleman Company draftsman drew up the blueprints for the house using the

facility's AutoCAD. Dean was told Jim Coleman Company could manufacture and sell awnings as an option for the house. Dean testified, without contradiction, that he was never told Jim Coleman Company did not have anything to do with the manufacture of modular houses or that Living Modular was a separate company; he thought Living Modular and Jim Coleman Company were the same company, but "different wings"; and he thought he was dealing with a well-established national company that "was affiliated with — you know, it was all one big, happy family: Coleman, Coleman and Coleman."

We conclude the evidence is legally sufficient to support a finding under DTPA section 17.46(b)(2) that Randy caused confusion as to the source, sponsorship, approval, or certification of Living Modular and the modular house. We also conclude the evidence is legally sufficient to support a finding under DTPA section 17.46(b)(3) that Randy caused confusion as to Living Modular's affiliation, connection, or association with, or certification by, Jim Coleman Company. Accordingly, Randy did not establish error on the face of the record with regard to his liability under the DTPA. We next determine whether Jim Coleman Company is liable for any conduct by Randy that produced the same confusion or misunderstanding.

On appeal, Jim Coleman Company asserts there is no evidence that (1) the actions of either Living Modular or Randy were the actions of Jim Coleman Company and (2) Randy or Living Modular had authority to bind Jim Coleman Company. The company contends none of the so-called representations establish it was "connected to" the sales transaction forming the basis of the suit.

A "DTPA claim based on sponsorship or approval is not dependent on any contractual relationship between the plaintiff and defendant." *Hennessey v. Vanguard Ins. Co.*, 895 S.W.2d 794, 803 (Tex. App.—Amarillo 1995, writ denied). In *Hennessey*, one of the defendants contended it did not make any representations to the plaintiffs. The court stated as follows:

> If it is appellees' contention that the DTPA requires an express false representation *by Republic*, and that acquiescence to the false representations of another is not sufficient, we disagree. The purposes of the DTPA would be greatly frustrated by excusing those who knowingly permit consumers to be misled by false representations that they have given sponsorship or approval when they, in fact, have not. This is particularly true when there is a close relationship between the party making the representation and the party whose sponsorship or approval is being asserted.

*Id.* at 804 (emphasis in original).

Here, there is no dispute about the close relationship between Randy and Jim Coleman Company based on the familial relationship and Randy's employment by Jim Coleman Company. There is no dispute that Randy—a Jim Coleman Company employee and member of the Coleman family—was actively involved in the sale of the modular house to Dean. Randy, Wayne, and Oaks used Jim Coleman Company facilities and at least one other Jim Coleman Company employee drafted the blueprints. A reasonable jury could have inferred Jim Coleman Company acquiesced in the use of its facilities and employees for the purpose of selling the modular houses. Also, Dean believed Living Modular operated on Jim Coleman Company's business premises. Finally, Randy told Dean that Jim Coleman Company could manufacture and sell awnings as an add-on option for the house. We conclude the evidence is legally sufficient to support the finding under DTPA section 17.46(b)(2) that Jim Coleman Company caused confusion as to the source, sponsorship, approval, or certification of Living Modular and the modular house.[6] We also conclude the

---

[6] Jim Coleman Company also asserts there is no evidence that it intentionally engaged in any false, deceptive or unfair act or practice. Section 17.46(b)(2) does not require a showing of intent. *See Miller v. Keyser*, 90 S.W.3d 712, 716 (Tex. 2002) ("A consumer is not required to prove intent to make a misrepresentation to recover under the DTPA."); *Tex. Real Estate Comm'n v. Asgari*, 402 S.W.3d 814, 819 (Tex. App.—San Antonio 2013, no pet.) (quoting *Miller*); *Smith v. Herco, Inc.*, 900 S.W.2d 852, 859 (Tex. App.—Corpus Christi 1995, writ denied) ("Intent to misrepresent, or knowledge that a representation is untrue, has never been an element of a DTPA 'laundry list' claim unless the specific provision requires intent."); *see also Pennington v. Singleton*, 606 S.W.2d 682, 689 (Tex. 1980) ("The 'laundry list' of violations in § 17.46(b) includes only four 'acts or practices' under which intent or knowledge is expressly required before a violation of the Act will be found: subdivisions (9), (10), (13), and (17). The legislature obviously was aware of the "intent" question since it did require intent or knowledge under these four subdivisions. Certainly if it meant for intent to be a requirement for all violations it would not have written it into four specific items without requiring it under the other subdivisions of § 17.46(b).").

evidence is legally sufficient to support a finding under DTPA section 17.46(b)(3) that Jim Coleman Company caused confusion as to Living Modular's affiliation, connection, or association with, or certification by, Jim Coleman Company.

Because the evidence is sufficient to support the jury's finding that at least one of the laundry list prohibitions in section 17.46(b) was violated, we need not address appellants' contentions as to the remaining alleged violations. *McLeod v. Gyr*, 439 S.W.3d 639, 650 (Tex. App.—Dallas 2014, pet. denied) (holding same); *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 625 (Tex. App.—Fort Worth 2006, pet. denied) (same); *see also* TEX. R. APP. P. 47.1 (opinion must address every issue necessary to final disposition of appeal).

## D.     Producing Cause

"A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is: (A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and (B) relied on by a consumer to the consumer's detriment . . . ." TEX. BUS. & COM. CODE § 17.50(a)(1).  On appeal, Dean's reliance and detriment is not specifically challenged.  Instead, Jim Coleman Company asserts there is no evidence that its misconduct was a producing cause of Dean's damages.

Producing cause requires that the act be both a cause in fact and a substantial factor in causing the plaintiff's injuries. *Brown v. Bank of Galveston*, 963 S.W.2d 511, 514 (Tex. 1998); *Ibarra v. Nat'l Constr. Rentals, Inc.*, 199 S.W.3d 32, 35 (Tex. App.—San Antonio 2006, no pet.). A producing cause is an efficient, exciting, or contributing cause that in the natural sequence of events produces injuries or damages. *Id.*  An act or omission is a cause in fact of an injury, if without it, the harm would not have occurred. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005); *Ibarra*, 199 S.W.3d. at 35.  Conversely, an act or omission is not a cause in fact if it does

no more than furnish a condition that makes the injury possible. *Urena*, 162 S.W.3d at 551; *Ibarra*, 199 S.W.3d. at 36.

When asked for his impression about what would happen if Living Modular could not perform or if the Coleman brothers could not deliver the house, Dean replied: "Well, they were backed by — they billed as a nationwide company, the Jim Coleman Company, and that they were — they could build car washes all over the nation, they could surely build a concrete home to [sic] South Texas." Dean stated the fact that Jim Coleman Company was a national company affected his decision to buy the house.

Considering the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference that would support it, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not, we conclude the evidence at trial would enable reasonable and fair-minded people to find that Dean invested in the modular house because he believed Jim Coleman Company—a national company—was affiliated with Living Modular. Therefore, the evidence is legally sufficient to support a finding of producing cause.

## DAMAGES

Appellants complain the trial court awarded damages in the amount of $47,659.38, but Dean pled for only $39,204. Appellants state Dean "should get his money back but only the money that he paid to Living Modular for the house that Living Modular failed to deliver and for" only the amount he pled in his petition.

Although a judgment must conform to the pleadings, any error in this regard is waived where the party fails to object to the amount of the judgment. *Borden, Inc. v. Guerra*, 860 S.W.2d 515, 525 (Tex. App.—Corpus Christi 1993, writ dism'd); *Siegler v. Williams*, 658 S.W.2d 236, 240-41 (Tex. App.—Houston [1st Dist.] 1983, no writ). The party making such an objection

should do so in a motion to limit the judgment to the amount pleaded or raise the issue in a motion for new trial. *Id.* Here, appellants did not move that the judgment be limited to the amount of the pleadings and did not raise this issue in a motion for a new trial. Therefore, this complaint is not preserved for our review on appeal.

Appellants also challenge the trial court's award of additional damages under DTPA section 17.50, which allows a prevailing consumer to obtain three times the amount of economic damages if the trier of fact finds that the conduct of the defendant was committed knowingly. TEX. BUS. & COM. CODE § 17.50(b)(1). Here, the trial court awarded three times the amount of economic damages, $142,978.14. Appellants assert the evidence is legally insufficient to support a finding that they acted knowingly.

The jury was instructed that "knowingly" means "actual awareness of the falsity, unfairness, or deceptiveness of the act or practice. Actual awareness may be inferred if objective manifestations indicate that a person acted with actual awareness." This instruction substantially tracks the definition of "knowingly" contained in the DTPA. *See* TEX. BUS. & COM. CODE § 17.45(9). Actual awareness may be inferred from the circumstances. *K.C. Roofing Co. v. Abundis*, 940 S.W.2d 375, 377 (Tex. App.—San Antonio 1997, writ denied); *Century 21 Real Estate Corp. v. Hometown Real Estate Co.*, 890 S.W.2d 118, 128 (Tex. App.—Texarkana 1994, writ denied). However, an award of additional damages cannot be premised on conduct that is inadvertent. *Century 21 Real Estate Corp.*, 890 S.W.2d at 128.

Here, Randy handed Dean his Jim Coleman Company business card. Randy and Wayne both told Dean they were employees of Jim Coleman Company. Dean and his wife were shown through Jim Coleman Company's facilities in Houston when the couple discussed purchasing a modular house. Randy and Wayne officed at Jim Coleman Company. A draftsman who worked at the company drew up the blueprints for the modular house. Models of the houses were on Jim

Coleman Company's property in Houston, and the company could make and deliver optional awnings for the house. Although circumstantial, we believe this evidence is legally sufficient to support a finding that Randy and Jim Coleman Company acted knowingly.[7]

## ATTORNEY'S FEES

Appellants assert the evidence in support of the award of attorney's fees is legally insufficient because the testimony was "conclusory," and the fees were not segregated among the three defendants and the two causes of action pled by Dean. Appellants did not raise a failure to segregate complaint before the trial court; therefore, that complaint is not preserved for our review on appeal. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997) (holding parties waive error regarding failure to segregate attorney's fees by failing to object); *see also* TEX. R. APP. P. 33.1(a).

Dean presented two witnesses in support of his request for an award of attorney's fees. Dean's attorney, Charlie Webb, testified he believed a reasonable hourly rate for handling a case such as this one was $250 per hour for himself and $120 per hour for his associate. The trial court admitted into evidence a "Summary of Attorney's Fees and Expenses" that detailed the date of the expense, the nature of the expense, and the name of the attorney and hours billed toward the expense. Webb also testified an additional 125 hours had been billed, which were not included on the summary, and he anticipated more fees would be billed until the conclusion of trial. Appellants did not challenge Webb at trial about the dates, nature of any expense, or the amount of time billed.

Dean also called Fred Dreiling as an expert. Dreiling, also an attorney, said he was familiar with the eight *Arthur Andersen* factors a factfinder may consider when determining the reasonableness of attorney's fees.[8] Based on his evaluation of the services provided to Dean and

---

[7] For this reason, we conclude Randy did not establish error on the face of the record with regard to damages.

[8] *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) ((1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2)

the eight factors, Dreiling testified $250 was a reasonable fee for a case such as this and a lawyer with Webb's experience. Dreiling believed attorney's fees in the range of $25,000 to $50,000 was appropriate for this case. Dreiling said his testimony would be the same for either the DTPA claim or the breach of contract claim. No questions were asked of Dreiling on cross-examination.

On this record, we conclude the evidence was not conclusory and was legally sufficient to support the award of attorney's fees.[9]

## JOINT AND SEVERAL LIABILITY

The trial court awarded identical sums against each defendant, and the judgment contains no joint and several liability language. In their final issue, appellants assert the judgment amounts to multiple recoveries for a single injury. On appeal, Dean agrees the injury sued upon was single and indivisible, but he contends there is nothing in the judgment to suggest it is anything other than a joint and several judgment. Because Living Modular, Randy, and Jim Coleman Company are jointly and severally liable for the full amount of the trial court's award (economic damages, additional damages, interest, attorney's fees, and court costs), the judgment should be modified to include joint and several liability.

## CONCLUSION

For the reasons set forth above, we modify the judgment to include joint and several liability and affirm as modified.

Sandee Bryan Marion, Chief Justice

---

the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered).

[9] For this reason, we conclude Randy did not establish error on the face of the record with regard to the award of attorney's fees.