In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00011-CR
______________________________


DAVID RUSSELL, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 71st Judicial District Court
Harrison County, Texas
Trial Court No. 03-0230X


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross
Concurring Opinion by Justice Carter

O P I N I O N

          David Russell was indicted on two counts of aggravated assault


 and one count of
escape.


 He pled not guilty to the aggravated assault charges and guilty to the escape
charge. A jury found Russell guilty of all three offenses. For these convictions, the jury
assessed the maximum punishment available for the enhanced offenses: three life
sentences. The trial court sentenced Russell in accordance with the jury verdict. Russell
appeals, contending that, due to the trial court's failure to grant his motion to change venue
and his motion for mistrial, he was denied his constitutional right to a trial by an impartial
jury.
I.        FACTUAL AND PROCEDURAL HISTORY
          The evidence showed the following sequence of events: On July 11, 2003, Harrison
County sheriff's deputy Judy Cadenhead was transporting Russell to a hospital for medical
treatment for an injury to his right arm. Russell had been in custody since July 6 for
evasion of arrest and various weapons charges. 
          Following his treatment, Russell and Cadenhead were on the hospital parking lot,
preparing to return to the Harrison County jail. Cadenhead opened the back passenger
door of her patrol vehicle, and Russell appeared to be in the process of sitting down in the
back seat. However, Russell suddenly yelled "no" and came out of the vehicle, hitting
Cadenhead and knocking her against a nearby vehicle with the car door. Russell began
ranting and charged at Cadenhead. He grabbed her gun belt, lifted her up, and pushed
her against a cement wall, fracturing her elbow. The two fell to the ground, and Russell
landed on Cadenhead and pushed her partly beneath another vehicle. Russell continued
screaming that he was going to kill Cadenhead, and the two struggled over control of her
weapon, which was at that point lodged against her body. 
          Johnny Kornegay, a hospital security guard, saw the struggle from the third floor of
the hospital and, although unarmed, ran down to help Cadenhead. Kornegay initially tried
to get Russell off Cadenhead; he then noticed the two were struggling over her gun. 
Kornegay tried to pull the gun away from its position lodged against Cadenhead's torso. 
At this point, all three had a hold on the weapon. As Cadenhead gripped the barrel area
of the gun, and as Kornegay was trying to wrestle the gun away from the direction of
Cadenhead's body, Russell fired the weapon. The bullet passed through a portion of
Kornegay's hand and grazed Cadenhead's left thigh. At this point, Russell gained control
of the firearm. 
          After Russell unsuccessfully demanded the keys from Cadenhead, he stopped a
motorist entering the parking lot, ordered her out of the car, and fled the scene. Hours
later, Longview police apprehended Russell as he crossed an apartment complex parking
lot. Russell was charged, in connection with this incident, with two counts of aggravated
assault, and one count of escape, causing bodily injury. 
          On September 3, 2003, Russell filed a motion to change venue, alleging he could
not receive a fair trial in Harrison County due to the extensive pretrial publicity the case
received. In support of his motion, Russell submitted ten newspaper articles, his own
affidavit, and the affidavits of nineteen other people stating there existed so great a
prejudice against Russell in Harrison County he could not obtain a fair and impartial trial
there. At the hearing on Russell's motion, he presented two witnesses who testified that
pretrial publicity would prevent Russell from receiving a fair trial in Harrison County. The
State presented five witnesses, all county officials, who testified they had not seen or heard
any indication, anywhere in the county, that Russell could not receive a fair trial in Harrison
County. The trial court denied Russell's motion for change of venue. 
          Jury selection began November 3, 2003. During voir dire, attorneys for the State
and for Russell questioned the panel about the amount and nature of publicity of the case
to which members may have been exposed. Defense counsel then asked those who had
indicated they had heard or seen some coverage of the case about the effect the publicity
had on their ability to remain impartial. Forty-four of the seventy-two-member venire said
they had heard or seen some coverage of the case. Of those who had heard some
publicity about the case, however, only eight stated they had formed an opinion with regard
to Russell's guilt or innocence. One of those eight who had formed an opinion, based on
pretrial publicity, was excused for cause and the remaining seven were well outside the
strike zone for jury selection. Four people on the jury panel had stated they had seen or
heard some coverage of the case, but had not formed an opinion as to Russell's guilt or
innocence.
          At the end of voir dire, Russell re-urged his motion to change venue and the trial
court again denied his motion. Russell also moved for a mistrial at that time, claiming the
jury panel was tainted by a statement made by a prospective juror "in regard to the
Defendant's prior 24 felony convictions." The trial court also denied this motion. 
II.       ANALYSIS: TRIAL BY AN IMPARTIAL JURY
          State and federal constitutions guarantee a defendant in a criminal case a right to
a trial by an impartial jury. U.S. Const. amend. VI; Tex. Const. art. I, § 10. Here, Russell
claims he was denied this right by the trial court's overruling of both his motion to change
venue and his motion for mistrial.
          A.       Overruling of Motion to Change Venue
          Russell contends the trial court erred in overruling his motion to change venue, and
as a result, denied him his constitutional right to a trial by an impartial jury.
          1.       Standard of review and applicable law
          The standard of review for this Court is whether the trial court abused its discretion
in refusing to grant the motion for change of venue. Ransom v. State, 789 S.W.2d 572,
579 (Tex. Crim. App. 1989). Absent a showing by the defendant that there exists such
prejudice in the community that the likelihood of obtaining a fair trial by an impartial jury is
doubtful, we will not disturb the trial court's decision to deny the motion to change venue. 
Id. 
          A trial court may grant a change of venue on a defendant's written motion in any
prosecution for a felony or misdemeanor punishable by confinement. The motion must be
supported by the defendant's own affidavit and the affidavits of at least two credible
persons, residents of the county of prosecution, stating there exists in the county of
prosecution so great a prejudice against him or her that the defendant cannot obtain a fair
and impartial trial. Tex. Code Crim. Proc. Ann. art. 31.03 (a)(1) (Vernon 1989).
                                a.       Nature of pretrial publicity
          An impartial jury is defined as one which does not favor a party or an individual
because of the emotions of the human mind, heart, or affections. It means that the
defendant, the cause, and the issues involved in the cause must not be prejudiced. See
Durrough v. State, 562 S.W.2d 488, 489–90 (Tex. Crim. App. 1978). Mere juror exposure
to information about a defendant's prior convictions or news accounts of the crime does
not, by itself, raise a presumption the defendant was deprived of due process and cannot
receive a fair trial by an impartial jury. Murphy v. Florida, 421 U.S. 794, 799 (1975). Jurors
do not have to be totally ignorant of the facts and issues of a particular case. Ransom, 789
S.W.2d at 579. Rather, for a defendant to prevail on his or her motion for change of
venue, such defendant must demonstrate that the publicity about the case is pervasive,
prejudicial, and inflammatory.


 Salazar v. State, 38 S.W.3d 141, 150 (Tex. Crim. App.
2001); DeBlanc v. State, 799 S.W.2d 701, 704 (Tex. Crim. App. 1990).
          Thus, pretrial publicity in the news media or extensive knowledge in the community,
regarding either the defendant or the offense, is not sufficient by itself to establish prejudice
or require a change of venue. See Dobbert v. Florida, 432 U.S. 282, 302–03 (1977);
Garcia v. State, 537 S.W.2d 930, 933 (Tex. Crim App. 1976). Widespread publicity which
is not inflammatory is not inherently prejudicial; nor is prejudice presumed from
inflammatory news coverage, unless it is shown to have permeated the local community. 
Crawford v. State, 685 S.W.2d 343, 350 (Tex. App.—Amarillo 1984), aff'd, 696 S.W.2d 903
(Tex. Crim App. 1985).
          The trial court may utilize voir dire to help gauge the "community climate of opinion
as to a defendant"; however, regardless of the successful qualification of a jury panel, the
evidence adduced during the pretrial hearing on the motion to change venue may dictate
that a change of venue be granted in order to assure the accused a fair and impartial trial. 
Henley v. State, 576 S.W.2d 66, 71 (Tex. Crim. App. 1978). In other words, the successful
qualification of a jury panel is not the sole criterion in determining whether a defendant is
entitled to a change of venue, since conscious or subconscious juror prejudice can affect
answers obtained on voir dire. Id.; Taylor v. State, 93 S.W.3d 487, 497 (Tex.
App.—Texarkana 2002, pet. ref'd).
                                b.       When publicity is deemed prejudicial
          In determining whether a defendant is entitled to a change of venue when prejudicial
pretrial publicity exists, the test required by due process is whether the defendant can
receive a trial by an impartial jury free from outside influences, or whether there is a
reasonable likelihood the pretrial publicity would prevent a fair trial. Adami v. State, 524
S.W.2d 693, 703–04 (Tex. Crim. App. 1975). Where outside influences affecting the
community's climate of opinion as to a defendant are inherently suspect, the resulting
probability of unfairness requires suitable procedural safeguards, such as a change of
venue, to assure a fair and impartial trial. Henley, 576 S.W.2d at 71.
          Some relevant factors in determining whether outside influences affecting the
community climate of opinion as to a defendant are inherently suspect are (1) the nature
of the pretrial publicity and the particular degree to which it has circulated in the
community; (2) the connection of government officials with the release of the publicity;
(3) the length of time between the dissemination of the publicity and the trial; (4) the
severity and notoriety of the offense; (5) the area from which the jury panel is to be drawn;
(6) other events occurring in the community which either affect or reflect the attitude of the
community or individual veniremembers toward the defendant; and (7) any factors likely
to affect the candor and veracity of the prospective jurors on voir dire. Id. at 71–72.
                     2.       Pretrial publicity was not of nature to warrant change of venue
          Both the evidence at the pretrial hearing on Russell's motion, and the examination
of prospective jurors during voir dire, support the trial court's ruling on the motion.
                                a.       Evidence at pretrial hearing
          Both the contents of the articles and the testimony presented at the hearing on
Russell's motion to change venue support the trial court's ruling on that motion. 
          Defendant's Exhibit 1 contains one news article


 suggesting Russell may have used
crack cocaine while he was hiding in an apartment. Russell argues that the use of the
word "rampage" in this article is inflammatory. However, the article does state that Russell
was "accused of a rampage." [Emphasis added.] Like most of the articles, this article
mentioned Russell's prior criminal history. The article does say that Russell said he was
going to kill someone.
          Defendant's Exhibit 2 contains four published items. The first item


 is a series of
four photographs depicting the Longview Police Department's apprehension of Russell. 
Below the photographs is a two-sentence description, giving minimal information, and
stating in passive voice that a "deputy and a security guard were shot." The article's title
refers to Russell as a "suspect," and the photographs do not depict any graphic or violent
scenes. In fact, it is difficult to determine what is occurring in the pictures. The second
item in Exhibit 2 is a news article,


 and in most part, is an interview with Russell's mother,
who described her adopted son as having the "face of an angel." This article also alludes
to Russell's extensive criminal past by stating he had "just recently been released from
prison, where he had spent most of his adult life." It gives few details of the event, focusing
instead on the impact the incident had on his family, particularly his mother. The article
seems to humanize Russell by discussing the incident with his heartbroken mother.
          The third item of Exhibit 2 is a news article


 stating that the events were still being
sorted out, but chronicling the known events of the afternoon. It also discusses Russell's
previous convictions and the events leading up to his most recent arrest and charges of
evading arrest, possessing firearms as a felon, and theft of firearms. The fourth and final
item in Exhibit 2 is a news article


 focusing almost exclusively on the actions of Kornegay
in coming to the aid of Cadenhead. Only two sentences in the article mention Russell. By
reading this article, one would not know that Russell had escaped and been apprehended. 
The article reveals only that Russell overpowered the deputy and that there was a struggle
over the gun.
          Defendant's Exhibit 3 contains two news articles. The first article


 focuses, not on
the event itself, but on a related aspect of the escape. It offers a description of the internal
affairs investigation into the escape and the conclusion of the investigator that Russell had
not been properly restrained. The investigator also concluded that, while Russell's injuries
were not feigned, he had been planning the escape. Most of the remainder of the article
outlines security procedures and proposed changes to those procedures. But the article
does end with the fact that Russell was apprehended and was in jail facing multiple
charges. The second article of Exhibit 3


 briefly states Russell escaped while being
transferred to the hospital and does not mention the shooting in its opening paragraph. 
The article then goes on to list the charges pending against Russell and the amount of bail
required for each. The second half of the article, continued on a later page, does mention
the shooting and also gives a detailed description of Russell's recent criminal history. It
quotes the district attorney as stating that Russell has twenty-four prior felony convictions
and that he has been incarcerated seven times and served a total of twenty-seven years
in prison. The second half of this article is arguably the most detailed in its description of
Russell's past convictions and depiction of him as a career criminal.
          Defendant's Exhibit 4 contains one news article.


 It devotes only a small amount
of print to the escape and shooting and, instead, focuses on Cadenhead's resignation. It
gives only vague background information concerning the incident with Russell.
          Likewise, the one article contained in Defendant's Exhibit 5


 gives only general
details. It is an editorial describing the event as a "brush with disaster." The editorial
attempts to point out lessons learned and discoveries made from the event. It also praises
area law enforcement agencies for their cooperative efforts and their professionalism. An
apparent reference to Russell is seen in the following conclusion: "The truth is that some
people are just bad and they will find ways to do bad no matter what or where they might
happen to be."
          Finally, the article identified as Defendant's Exhibit 6


 begins with a description of
the deputy's injuries, her current condition, and steps being taken by the medical team in
furtherance of her recovery. The reader discovers the source of those injuries later when
the article describes the escape. It also describes previous charges pending and additional
charges levied against Russell in connection with the escape. The article consists mostly
of a description of the actions of the three people involved in the struggle and of
Cadenhead's personal background gained from an interview with her grateful and reflective
surrogate son.
          In addition to these news articles, the trial court heard live testimony at the hearing
on Russell's motion for change of venue. Defense witness Joe Pollani, a retired prison
psychologist and friend of Russell's stepfather, testified he was "aware of a considerable
amount of publicity" surrounding the case. He stated he knew of at least five newspaper
articles, "if not more." The newspapers, he admitted, used words such as "alleged" and
"suspect," but he thought people concentrated more on the "sensational nature of the
reports." He could not recall having seen a television news segment on Russell and did
not know of any other coverage of the incident from any other source. He also described
conversations in which it appeared people had concluded Russell was guilty. These
conversations were mostly limited to his Sunday school class of six to twelve men,
including Russell's stepfather. By his own admission, he was uncertain about using the
word "prejudice." The majority of his conversations had occurred among church members
where, he opines, some people had come to the conclusion that, given what the
newspaper said, Russell was probably, if not definitely, guilty of the charges against him. 
          Russell, testifying on his own behalf at the hearing, also said there was a great deal
of pretrial publicity concerning him. He testified a news crew filmed him entering the
courthouse the morning of the hearing. He further testified deputies at the jail had shown
him newspapers. He said other inmates recognized him from having seen him on
television or in the newspaper. 
          The State presented witnesses, all elected county officials, whose testimony
supported the conclusion Russell could receive a fair trial in Harrison County. Some
testified that, even though they had heard about the case, they had heard no one give an
opinion on whether Russell was guilty. One witness had heard very little about the case
at all. 
                                b.       Voir dire examination 
          The examination of prospective jurors during voir dire also supports the trial court's
overruling of Russell's motion for change of venue. While forty-four of the seventy-two
members of the venire reported having heard or read some coverage of the events, only
eight admitted having formed an opinion concerning the case. None of those eight sat on
the jury. 
          The case before us presents similar statistics as those presented in Von Byrd v.
State, 569 S.W.2d 883 (Tex. Crim. App. 1978). In Von Byrd, attorneys examined 109
prospective jurors. Id. at 890. At least sixty-nine of the prospective jurors had either heard
or read about the case, representing sixty-three percent of the venire.


 Twenty-one
prospective jurors were excused on challenge for cause.


 Id. The state and Von Byrd
each exercised fifteen peremptory strikes, and then twelve were seated as jurors. See id. 
Although the Texas Court of Criminal Appeals found that a majority of the prospective
jurors had heard or read of the case, it emphasized that all twelve who served on the jury
testified they could and would decide the case strictly on the evidence introduced and
would base their verdict on what was heard and observed in the courtroom. Id. Likewise,
the voir dire examination supported the conclusion that the jury was impartial, and the jury
selected was composed of persons who stated they were able to base their verdict on the
evidence presented. Id. 
          Based on the nature of the publicity the trial court had before it and the testimony
adduced at the hearing on Russell's motion, the trial court reasonably concluded Russell
could obtain a trial by an impartial jury in Harrison County. Additionally, each of the jurors
selected indicated at voir dire that their verdict would not be affected by pretrial publicity. 
We hold that the trial court did not abuse its discretion when it overruled Russell's motion
to change venue. We overrule his first point of error.
          B.       Overruling of Motion for Mistrial
          Russell next contends the trial court erred in failing to sustain his motion for mistrial
when a prospective juror made the comment in open court that he understood Russell had
twenty-four prior offenses. This comment, Russell argues, tainted the jury panel and, thus,
denied him his constitutional right to a trial by an impartial jury. 
                     1.       Standard of review and applicable law
          We review a trial court's ruling on a motion for mistrial for an abuse of discretion and
must uphold the trial court's ruling if that ruling was within the zone of reasonable
disagreement. Wead v. State, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). Additionally,
the conduct of voir dire examination lies within the sound discretion of the trial court. 
Mendoza v. State, 552 S.W.2d 444, 447 (Tex. Crim. App. 1977).
          Comments or questions by prospective jurors, made in the presence of the entire
panel, may be harmful to the defendant. To be prejudicial, the remark must be reasonably
calculated to prejudice other members of the panel. Alfano v. State, 780 S.W.2d 494, 496
(Tex. App.—Corpus Christi 1989, no pet.). Making a jury panel—and thus, the jury
selected from that panel—aware of a defendant's prior criminal record is inherently
prejudicial because of the jury's natural inclination to infer guilt of the charged offense from
that record. See Tex. R. Evid. 609(a); Abdnor v. State, 871 S.W.2d 726, 738 (Tex. Crim.
App. 1994); Enriquez v. State, 56 S.W.3d 596, 602 (Tex. App.—Corpus Christi 2001, pet.
ref'd). In the instant case, however, Russell's counsel invited the objectionable comment
made by the prospective juror, and Russell's motion for mistrial, based on that comment,
was untimely.
                     2.       Invited errorDuring voir dire, Russell's counsel was questioning the jury panel, row by row, about
whether they had seen or heard anything on television, or read anything in the newspaper,
about the case that caused them to form any opinions concerning Russell's guilt. The
objectionable comment came in the following exchange:
          [COUNSEL]: On this side. That's Ms. Perkins, Mr. Miller and
Mr. Jack. Anything that you saw or heard and formed any opinion about
Mr. Russell's case?

          JUROR:        (No audible response)

          [COUNSEL]: Mr. Bates?
 
                     JUROR:        I understand that he had 24 criminal priors.

          Shortly after this exchange, the trial court instructed another prospective juror not
to refer to the content of what he may have heard on television or read in the newspaper. 
However, at no time before Juror Bates uttered his comment about the "24 criminal priors"
had Russell's counsel instructed the panel not to disclose what they may have read in the
newspaper or heard on television. In fact, at that point in the voir dire, counsel had already
specifically asked another prospective juror what information she had heard or seen with
regard to this case. Therefore, based on counsel's questioning of the other panel
members, and based on the way the question had been phrased when Bates was called
on to respond, Bates could have reasonably believed his answer was responsive to the
questioning. We therefore conclude that, if the trial court erred in denying Russell's motion
for mistrial, his counsel invited the error.
          The law of invited error estops a party from asserting error based on an action that
party induced. Prystash v. State, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999). One cannot
invite a prejudicial comment from a prospective juror and then rely on that comment for a
mistrial. Such a situation was presented in Century 21 Real Estate Corp. v. Hometown
Real Estate Co., 890 S.W.2d 118, 128–29 (Tex. App.—Texarkana 1994, writ denied). 
There counsel for International and South Central asked the jury panel members to
indicate if they had any feelings about the case. One panel member did and proceeded
to express his strong feelings against International and South Central's position in the
case. Like counsel for Russell in the instant case, counsel for International and South
Central did not object to the comment at the time it was made but, before the selected
jurors were seated, asked the court to grant a mistrial because the prospective juror's
comment had so prejudiced the minds of the other panel members as to prevent
International and South Central from obtaining a fair trial. The trial court overruled the
motion, noting that counsel had invited the comment. This Court affirmed the trial court's
denial of the motion. See also Patterson v. State, 654 S.W.2d 825, 827 (Tex.
App.—Dallas 1983, pet. ref'd).
                     3.       Motion for mistrial untimely
          Further, Russell's motion for mistrial was untimely. The prospective juror's comment
that formed the basis for Russell's motion appears on page forty-six of the reporter's
record. No objection was made to the comment until after counsel had completed his voir
dire, the jury lists were struck, and the jury was seated in the jury box. That is when
Russell made his motion for mistrial, which appears on page sixty of the reporter's record. 
           To be timely, a motion for mistrial must be "raised at the earliest opportunity" or "as
soon as the ground . . . becomes apparent." See Martinez v. State, 867 S.W.2d 30, 35
(Tex. Crim. App. 1993); Ponce v. State, 127 S.W.3d 107, 110 (Tex. App.—Houston [1st
Dist.] 2003, no pet.); Thomas v. State, 884 S.W.2d 215, 216 (Tex. App.—El Paso 1994,
pet. ref'd). 
          In Farris v. State, 155 Tex. Crim. 261, 233 S.W.2d 856, 859 (1950), Farris
complained of the trial court's failure to declare a mistrial because the jury panel was
present in the courtroom while Farris' counsel was presenting preliminary motions to the
court. No one noticed that the jury panel was seated in the courtroom until one of the
panel members approached the court with a request to be excused. Nonetheless, Farris
apparently waited until after the jury was selected to urge his motion for mistrial. The
Texas Court of Criminal Appeals held that he waited too late.
          In Cagler v. Mississippi, 844 So.2d 487, 494 (Miss. Ct. App. 2003), Cagler
contended that a person on the jury panel gave answers to a question that "poisoned the
entire jury pool" and that the trial court erred when it overruled his motion for mistrial. 
Citing Saucier v. State, 328 So.2d 355, 357–58 (Miss. 1976), where the Mississippi
Supreme Court held that a motion for mistrial came too late when the party waited until a
jury had been impaneled, the Mississippi Court of Appeals held the trial court did not err
in overruling Cagler's motion for mistrial, noting Cagler waited until voir dire was concluded,
the challenges for cause and peremptory strikes had been made, and the jury selected
before he made his motion. The court further pointed out that Cagler could have easily
made his motion for mistrial during voir dire while the court and the parties could still ask
questions in order to determine the feelings and beliefs of the potential jurors.
          The facts in Cagler are very similar to the instant case. The ground for a mistrial
should have been apparent to Russell at the time the potential juror uttered his comment
about the "24 criminal priors." Yet he made no objection to the comment at that time, but
continued to the completion of his voir dire and waited until after the challenges for cause
and peremptory strikes had been made and he saw who was on the jury, to move for a
mistrial. As the ground for his motion was not "raised at the earliest opportunity," the trial
court did not abuse its discretion in overruling it. 
 

III.      CONCLUSION
          Having concluded that the trial court's failure to grant Russell's motion to change
venue did not deny him his constitutional right to a trial by an impartial jury, that Russell's
counsel invited the objectionable comment made by the prospective juror, and that his
motion for mistrial, based on that comment, was untimely, we overrule his points of error. 
          The judgment is affirmed.
 
Donald R. Ross
Justice



CONCURRING OPINION

          I agree with the majority opinion except with regard to the discussion of invited error.
          As shown in the majority opinion, this case involved a great deal of pretrial media
coverage. Counsel for Russell properly was attempting to inquire of the veniremembers
if this publicity had caused them to have an opinion as to the defendant's guilt. He began
by asking if anyone had heard anything or read newspapers about the case and then
asked one of the jury panelists, "[W]hat information did you hear or see with regard to this
case?" Following that answer, he then asked, "Did you form any opinion whatsoever after
seeing that information on the news?" He then began to examine each row of jurors
asking, "Did you form an opinion based on what you read or saw on television with regard
to Mr. Russell's guilt or innocence?" "Same question to Ms. Thompson and Mr. Campbell? 
Did you form any opinion about what you saw or heard?" The reporter's record reflects
that Russell's counsel then asked a question nine additional times as to whether the
members had formed any opinion on what they had seen or heard before asking Juror
Bates, "Anything that you saw or heard and formed any opinion about Mr. Russell's case?" 
The response was, "I understand that he had 24 criminal priors."
          The majority concludes that, since counsel's question could have led the juror to
reasonably believe his answer was responsive, the question invited error. I disagree. 
Invited error normally occurs when a party takes some action that leads a court into error. 
Therefore, the party cannot complain of the court's action. This is illustrated by several
cases. In Prystash v. State, 3 S.W.3d 522 (Tex. Crim. App. 1999), the defendant
requested the court omit a jury instruction concerning the requirement for holding one
criminally responsible as a party for capital murder when he did not personally kill the victim
and on appeal complained of such omission. Similarly, in Ex parte Guerrero, 521 S.W.2d
613 (Tex. Crim. App. 1975), a defendant requested the trial court to assess his sentences
consecutively and then later complained of it. Likewise, in Santellan v. State, 939 S.W.2d
155 (Tex. Crim. App. 1997), the defendant requested the trial court to instruct the jury
concerning the law of parole and then complained of the instruction. In each of these
instances, the defendant was barred or estopped from such complaint as his actions
induced the court to commit an error. Here, there is no contention defense counsel caused
the trial court to err.
          I do not believe that counsel's question can be considered as an invitation to create 
error. It is true counsel had asked one juror what he had seen or heard, but by far the
preponderance of the questions and the general tenor inquired about was whether the
jurors had formed an opinion of Russell's guilt from what they had seen or heard.
          The cases cited in the majority opinion correctly state the general rule that an invited
error estops a party from asserting error based on an action that party induced, but do not
support the conclusion that the action in this case constitutes invited error. As mentioned,
the Prystash case involved the defendant requesting the omission of an instruction and
later complaining of it. In Century 21 Real Estate Corp. v. Hometown Real Estate Co., 890
S.W.2d 118 (Tex. App.—Texarkana 1994, pet. denied), the court held that the trial court
has discretion to deny a mistrial and that a party complaining of it must show that the
court's action was an abuse of discretion and reasonably calculated to cause and probably
did cause the rendition of an improper judgment. Since the defendant did not show it was
prejudiced or that the court abused its discretion and the jury was properly instructed, this
Court affirmed the judgment. Even though the trial court stated that comment was invited,
this Court did not rely on or mention the doctrine of invited error in affirming the judgment. 
          A party may be estopped from complaining if the party's conduct during the course
of a trial is so egregious as to constitute a deliberate attempt to cause a mistrial. In Franks
v. State, 961 S.W.2d 253 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd), the defendant
personally initiated conversations with members of the jury and later complained about the
jury having improper contacts with him. The court invoked the doctrine of invited error and
stated that otherwise the defendant could "deliberately cause a mistrial by engaging in
such unauthorized conversation with jurors." Id. at 255.
          I do not believe this case involved the doctrine of invited error. Clearly, the defense
attorney did not induce the trial court to commit an error for which he is now complaining. 
Furthermore, I do not believe that this case represents such egregious conduct to
"deliberately cause a mistrial" such as in Franks. The questions defense counsel posed
were legitimate attempts to inquire of the veniremembers if they had already formed an
opinion as to whether Russell was guilty. I believe that the answer by Juror Bates was
nonresponsive. Even if the answer can be construed as responsive to a poorly framed
question, I do not believe counsel's action indicated a deliberate attempt to cause a
mistrial. Since defense counsel's conduct neither (1) caused the court to commit error, or
(2) was an attempt to deliberately cause a mistrial, the doctrine of invited error is not
applicable.
 

          In all other respects, I agree with the majority opinion and therefore concur in the
judgment.
 
                                                                           Jack Carter
                                                                           Justice

Date Submitted:      July 19, 2004
Date Decided:         September 1, 2004

Publish