

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00142-CR

TYREK NEAL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 76th District Court
Camp County, Texas
Trial Court No. CF-21-02862

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

After waiving his right to a jury trial, Tyrek Neal pled guilty to the offense of murder. *See* TEX. PENAL CODE ANN. § 19.02 (Supp.). Neal elected to have a jury determine punishment, which it assessed as life in prison. Neal appeals, maintaining that the trial court erred when it denied his motion to transfer venue. Because we find no error below, we affirm the trial court's judgment of conviction.

I.     **The Trial Court Did Not Abuse Its Discretion When It Denied Neal's Motion to Transfer Venue**

In his sole point of error, Neal maintains that the trial court abused its discretion when it denied his motion to transfer venue "in light of pervasive, prejudicial, and inflammatory social media coverage initiated by the deceased's family, which removed any chance of Neal receiving a fair sentencing hearing in Camp County."

A.     **Applicable Law and Standard of Review**

"An impartial jury is defined as one which does not favor a party or an individual because of the emotions of the human mind, heart, or affections. It means that the defendant, the cause, and the issues involved in the cause must not be prejudiced." *Russell v. State*, 146 S.W.3d 705, 710 (Tex. App.—Texarkana 2004, no pet.) (citing *Durrough v. State*, 562 S.W.2d 488, 489–90 (Tex. Crim. App. 1978)); *Mumphrey v. Florida*, 421 U.S. 794, 799 (1975). "Sometimes, however, situations arise in which pretrial publicity is so pervasive and prejudicial as to create a reasonable probability that an impartial jury cannot be empaneled even with the most careful voir dire. In such situations, a change of venue is compelled by the Fourteenth Amendment's due

process clause." *Narvaiz v. State*, 840 S.W.2d 415, 428 (Tex. Crim. App. 1992) (citing *Rideau v. Louisiana*, 373 U.S. 723 (1963)); *see* U.S. CONST. amend. XIV.

A trial court may grant a change of venue on a defendant's written motion in any prosecution for a felony or misdemeanor punishable by confinement. Article 31.03 states, in part:

> (a)   A change of venue may be granted in any felony or misdemeanor case punishable by confinement on the written motion of the defendant, supported by his own affidavit and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes, the truth and sufficiency of which the court shall determine:
>
> 1.   That there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial; and
>
> 2.   That there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial.

TEX. CODE CRIM. PROC. ANN. art. 31.03(a). "The defendant seeking a change of venue bears a heavy burden to prove the existence of such prejudice in the community, that the likelihood of obtaining a fair and impartial trial jury is doubtful." *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006) (citing *DeBlanc v. State*, 799 S.W.2d 701, 704 (Tex. Crim. App. 1990)). Furthermore, "[m]erely because a particular case is publicized in the media does not give rise to an automatic showing of prejudice such that the defendant is entitled to a venue change; jurors do not have to be totally ignorant of the effects and issues of a particular case." *Id.* Instead,

3

for a defendant to prevail in his motion to change venue, he must demonstrate that publicity about the case is pervasive, prejudicial and inflammatory; that is, a defendant must demonstrate an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come."

*Id.* (quoting *DeBlanc*, 799 S.W.2d at 704).

The standard of review on appeal from a trial court's denial of a motion to transfer venue is an "abuse of discretion." *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). We will not disturb the trial court's decision to deny a motion to transfer unless it "falls within the zone of reasonable disagreement." *Id.*

### B.    The Hearing

On July 5, 2023, the trial court held a hearing on Neal's motion to transfer venue. Neal argued,

[T]he only evidence I really need to produce to the Court that's filed with the motion was a smattering, just a few of the Facebook posts of the victim's parents that we have looked at and seen. Evidently they started back when he was first arrested on this, and the latest one that I have placed on the -- attached to the motion -- took place just this past June 23rd, which is really almost two weeks ago.

The Court has been able to look at them. I know the DA has, too, but they're just comments after comments, and I would encourage the Judge to look at the ones, also, that I know you have in your file and the DA has, which are a voluminous amount of Facebooks that have gone back and forth from the victim's parents, talking about how my client needs to be killed; he should get the death penalty; that they have a family firing squad; what kind of guns they would use; the fact that the father says, you know, may God bless my soul because if they give me five minutes with him, you know, he'll shoot him and take him out. Just numerous amounts.[1]

---

[1]Over no objection by the State, the trial court admitted into evidence the referenced Facebook posts.

4

Neal goes on to argue that ninety-five people made comments in response to one of the earlier Facebook posts and that there were "over a hundred-and-something that made comments throughout all of them." According to Neal, he believed the comments were prejudicial and that he could not get a fair trial in Camp County, but he also conceded that he had been unable to find two Camp County residents who would submit affidavits in support of his motion. As a result, Neal asked the trial court to waive that requirement.

In support of its position, the State presented A.J. Mason, the county judge of Camp County. Mason testified that Camp County had 12,600 residents and that, out of those 12,600 residents, not one of them had contacted him or had asked about Neal's case. Likewise, Mason did not believe that there had been "excessive prejudicial opinion among the citizens" regarding Neal's case.

George Lynn French, precinct one commissioner of Camp County, testified that he had been elected to speak on behalf of the citizens of his precinct. Like Mason, French said that not one person within his precinct had contacted or communicated with him about Neal's case. French stated, "I don't even know anything about it. I mean, I haven't heard nothing." French also testified that he had not witnessed anything that would prevent Neal from getting a fair trial in Camp County.

After hearing from the witnesses and listening to counsels' arguments, the trial court denied Neal's motion to transfer venue.

**C.    Discussion**

In this case, Neal complained that he received negative pretrial publicity as a result of Facebook posts made by the victim's relatives, in particular, her father.[2]  Those posts included, but were not limited to, the following:

- "Since it's already on Facebook . . . Sometime last night or this morning my daughter was shot and killed And we don't know what happened Anyone that knows anything about it please come forward RIP Makayla Goodson I love u baby girl we will find out who did they are working on it now."[3]

- "U ghetto fabulous mfer I won't rest until they catch u . . . ur such a big man hurting my little girl come give some of what u got I'm waiting and watching . . . Makayla Goodson #justiceforMakayla."[4]

- "Murder???? 1st degree murder premeditated murder . . . Capital murder #justiceformakayla . . . . Makayla Goodson."[5]

- "Judgment day is coming Makayla Goodson God will pour out his vengeance upon him and sift him as wheat."[6]

- "This is how I felt until u came along God sent u to save me Makayla Goodson and I failed u I'm sorry baby girl I love u."[7]

---

[2]Neal states that the Facebook posts at issue were posted from the victim's father's and stepmother's joint Facebook account.

[3]Neal points out that the November 6, 2021, post received 925 "likes," 497 comments, and 142 shares.  Of those 497 comments, there was only one that was available for our review.  It said, "Prayers for you and the family."

[4]The November 7, 2021, post received 182 "likes," twenty-seven comments, and six shares.  The comments included, "Please tell me they atleast [sic] have a suspect, no need to wait for them to go get em!"; "I hope she, your family, gets Justice, and I hope it's the old school way."; "Would love to SNATCH HIS HEART OUT."; "[I]'m with you micheal let's find this pos."; and "Prayers for y'all and I pray they find whoever did this."

[5]The January 10, 2022, post received eighty "likes," twelve comments, and three shares.

[6]The June 10, 2022, post received eighty-two "likes" and thirteen comments.  The majority of those comments included multiple "amens."

[7]The September 29, 2022, post received forty-five "likes" and five comments.  Most of those comments were directed to the father in an effort to empathize with him over his daughter's death.

- "The dad of Makayla Goodson seeks the death penalty for the pre meditated brutal murder of his daughter that is the plea I offer may God have mercy on my soul #justiceformakayla just put me in the room with him for 5 min . . . her life was just as important as a public servant to us."[8]

- "I'm still loving u Makayla Goodson as I listen to this song I think how at the end I created distance between us to try to make u grow up I wish I could go back In time to erase that part cause u where [sic] way smarter than me cause u lived as a free spirit . . . u always knew your fate . . . I call u paranoid when u were getting visions from God so u lived in the moment u truly done things ur way . . . Im still loving us as the guitars scream so does my heart . . . the riders are coming and hell is following after . . . I miss u so much I'm devastated."[9]

- "On July 11 2023 we will gather together in ur name before God and justice will prevail . . . Makayla Goodson we love u."[10]

First, Neal argues, "In light of the record in this case, there is a substantial likelihood that prospective jurors' answers on voir dire were affected by the social media coverage of the case and the influence Goodson's family and others in the community sought to exert over the Camp County jury pool."

According to Neal, 450 potential jurors were summoned for jury service, with 142 individuals actually making an appearance. Twenty-six of those making an appearance were excused by the court prior to jury selection, leaving 116 potential jurors. Neal states that, of

[8]The November 17, 2022, post received over 245 "likes," thirty-six comments, and six shares. Many of the posts said things such as "God please bless this family."; "Hugs and lots of prayers."; and "The world is so evil . . . I will pray for justice and peace for your family." However, some of the posts seemed more brash. For instance, one person posted, "Yes I agree! I hope when he goes to prison and sits on death row that it eats him alive!!! And when his time comes you can be a witness!! I pray this is over soon knowing this monster is allowed to have the right to live is terrible." But, it also appears that at least one person was not aware of who the alleged murderer was, posting, "I totally agree!! Have they found the person who did it? Praying for justice!!!"

[9]The February 2, 2023, post received sixty-one "likes" and six comments. All of the comments referred to prayers for the family.

[10]The June 23, 2023, post received 109 "likes" and seventeen comments. Along with prayers and well-wishes for the victim's family, there were also more aggressive comments: "I got one that goes in the size of a 12 mag bores a tunnel and comes out the size of a cue ball."

7

those 116 potential jurors, twenty-nine admitted during jury selection that they had previously heard about Neal's case, either through social media or the victim's family. Ten of those twenty-nine admitted that they could not be fair and impartial when determining Neal's punishment. The record shows that at least twenty-three potential jurors were excused for cause. On the other hand, several prospective jurors insisted that they could be fair and impartial regardless of "having known or been related to [the victim] or her family members or having spoken to [the victim]'s family members about the case."

Nothing that occurred in Neal's jury selection is distinguishable from any other jury selection. The trial court excused those jurors who conceded that they could not be fair due to previous relationships with the victim or her family or because of information they had heard about the case before trial. Those who said they could be fair were allowed to remain on the panel. Even without the jurors who were excused for cause, there was a sufficient number of individuals remaining to make up a fair and impartial jury. Neal has presented no evidence to show that any of the complained-of jury panel members, or any of the individuals who actually sat on the jury, were prejudiced against him as a result of seeing the Facebook posts. Without more, Neal's line of reasoning is less than compelling.

In their briefs, both parties discuss *Tracy v. State*, 597 S.W.3d 502 (Tex. Crim. App. 2020). In that case, Tracy was charged with, and convicted of, the capital murder of a correctional officer who worked at the Telford Unit of the Texas Department of Criminal Justice, which is located in Bowie County, Texas. *Id.* at 506, 509. Prior to trial, Tracy filed a motion to change venue, arguing that there was excessive and prejudicial pretrial publicity. *Id.* at 509.

8

Specifically, he argued that, because the Telford Unit was "an important economic entity in Bowie County," there was "a likelihood that a fair and impartial trial would be impossible." *Id.* The trial court denied his motion, and Tracy appealed.

In support of his contention that he could not receive a fair and impartial trial in Bowie County, Tracy attached two affidavits to his motion and presented at least one witness at the hearing on his motion. *Id.* at 510. First, Brent McQueen, a fact investigator for the defense, "testified to the presence of online comments made by correctional facility employees and other residents of Bowie County on the various social media and blog posts referring to or sharing the articles covering the case." *Id.* Yet, on cross-examination, McQueen conceded "that he could not estimate the number of people who had seen" the posts. He also conceded that the information contained in newspaper articles about the incident had been reported correctly. *Id.*

"The State called Bowie County Judge James Carlow" who "testified that there [were] nearly 100,000 residents in Bowie County" and that none [of those residents] had contacted him about [Tracy]'s case." *Id.* Carlow "believed [Tracy] could receive a fair and impartial trial in Bowie County, that there was not excessive prejudicial opinion among the citizens of Bowie County towards [Tracy], and that the news coverage was not prejudicial or inflammatory." *Id.*

In addition, Tom Whitten, Bowie County commissioner, testified that he was an elected official and that he had been elected to speak on behalf of the citizens of precinct two. Whitten stated that "he had been asked no questions concerning [Tracy] or the case." *Id.* Whitten also agreed with Carlow's opinion that Tracy could receive a fair and impartial trial in Bowie County. *Id.*

9

The Texas Court of Criminal Appeals affirmed the trial court's denial of Tracy's motion for change of venue, stating, in part,

> Testimony at the hearing supports the conclusion that the media coverage was not extensive, inflammatory, or prejudicial. Although there were a number of print and digital newspaper articles and social media posts relating to the case, there was no estimate of how many people in Bowie County actually received or read those articles. A large part of the testimony related to comments made on the articles online, shares on personal Facebook pages, and other reactions on social media pages such as "likes" in response to the articles being posted online. But testimony also showed that many of the people commenting, posting, and responding to the articles were not even Bowie County residents, and would not be in the jury pool.

*Id.*

Neal contends that *Tracy* is distinguishable from this case, maintaining that "the publicity [in his case] was far more pervasive than [it was] in *Tracy*." Neal claims that "[he] presented evidence of hundreds of social media posts, responses, comments, and likes." Even assuming, without finding, that Neal's contention is correct, the amount of publicity is not the only factor to be considered when determining whether the trial court abused its discretion when it denied his motion to transfer. In other words, the fact that Neal's case was publicized via Facebook posts "does not give rise to an automatic showing of prejudice" that entitled him to a change of venue. *Renteria*, 206 S.W.3d at 709 (citing *DeBlanc*, 799 S.W.2d at 704). "[J]urors d[id] not have to be totally ignorant" of the facts of his case. *Id.*

In *Henley v. State*, the Texas Court of Criminal Appeals set forth a non-exclusive list of factors that may be considered on review of a trial court's denial of a motion to transfer venue. They are as follows:

10

(1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.

*Henley v. State*, 576 S.W.2d 66, 71–72 (Tex. Crim. App. 1978).

In this case, we begin by pointing out that Neal's name was not included in any of the Facebook posts contained in the record. That said, Neal contends that "over a hundred-and-something" people responded to the victim's father's posts, which, according to Neal, was evidence that he could not get a fair trial. Yet, the State presented evidence to show that there were 12,600 citizens residing in Camp County, which meant that only a very small number of residents either saw or responded to the victim's father's Facebook posts. Of those who saw or responded to his posts, there was no indication as to how many of those individuals resided in Camp County. But, as Neal pointed out, there was a much larger population of potential jurors involved in the *Tracy* case, making the trial court's denial of Tracy's motion to transfer venue more palatable. While that may be so, Neal failed to present any evidence to show that the Camp County community as a whole had a negative attitude toward him as a result of the Facebook posts or that there was a strong likelihood that they would be prejudiced against him at trial. In fact, Neal was unable to locate even two individuals, out of 12,600 Camp County residents, who would submit affidavits in support of his position that he could not get a fair trial in their county.

Furthermore, Mason and French testified that, even though they dealt with the general public on a day-to-day basis, neither of them had been contacted by a Camp County resident

11

about the case.  Moreover, French said that he had not even known that Neal's case existed.  In addition, there was no evidence that the State was involved in the dissemination of the Facebook posts or that it had encouraged the victim's father to do so.  Although the victim's father posted over a twenty-month period, it does not appear that he posted on a daily basis, or even a monthly basis.  In sum, "[t]he evidence fell short of demonstrating 'an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come.'"  *See id.* at 891 (quoting *Tracy*, 597 S.W.3d at 509).  For these reasons, we find that the trial court did not abuse its discretion when it denied Neal's motion to transfer venue.

We overrule Neal's sole point of error.

## II.     Conclusion

We affirm the trial court's judgment of conviction.


                                        Scott E. Stevens
                                        Chief Justice


Date Submitted:     March 5, 2024
Date Decided:       April 12, 2024

Do Not Publish

12