NUMBER 13-06-590-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JEFFREY RYAN BUCKNER HILL, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 139th District Court 

of Hidalgo County, Texas

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Garza and Vela


Memorandum Opinion by Justice Vela



 Appellant, Jeffrey Ryan Hill, pleaded guilty to the murder of Virginia
Huddleston, and the trial court sentenced him to sixty years in prison. By two issues,
he argues the trial court erred by denying his motion to suppress his statements and
by denying his motion to transfer venue. (1) We affirm.

 I. Motion to Suppress


 The trial court held a hearing on appellant's motion to suppress. (2) At the
hearing, the evidence showed that appellant was arrested about May 26, 2003 for
evading arrest. After his arrest for that offense, he requested a court-appointed
attorney. However, an attorney was not immediately appointed. (3) 

 On June 3, 2003, Officers David Ramos and Ramiro Nino interviewed appellant
at the Hidalgo County jail. Prior to the interview, Ramos and Nino were treating the
Virginia Huddleston case as "a missing person case." Before starting the interview,
Ramos read appellant his Miranda warnings. He testified appellant understood his
rights. Ramos also testified that when he asked appellant if he had an attorney,
appellant replied that he did not need one. He stated that appellant agreed to waive
his rights and speak to them.

 Appellant told Ramos and Nino that when he was with Huddleston at her
apartment, he blacked out. When he woke up, Huddleston was dead. He put her
body in a suitcase and left the suitcase by a hill of dirt.

 After appellant showed Ramos and Nino the location of Huddleston's body,
they took appellant to the McAllen police station where Nino obtained his written
statement. (4) Ramos testified Nino gave appellant his Miranda warnings, that appellant
waived them, and that appellant did not ask for a lawyer.

 After obtaining the written statement, Ramos and Nino returned appellant to
jail. There, Ramos and Nino obtained his videotaped statement. (5) The transcript of
the videotaped statement reflects that Ramos gave appellant the Miranda warnings,
that appellant waived them, and that appellant did not ask for a lawyer.

 On cross-examination, Ramos testified that appellant "looked like he was in
good health" and that "There was no indication that he was having any mental
problems." He also testified that during the times he and Nino interviewed appellant,
appellant neither asked to terminate the interviews nor requested a lawyer. 

 Nino testified that prior to obtaining appellant's written statement, he read him
the Miranda warnings. When the prosecutor asked Nino, "Did he [appellant], in your
opinion, understand these rights?" and "Did he knowingly and intelligently and
voluntarily waive such rights and agree to talk to you?", he answered affirmatively to
both questions.

 On cross-examination, Nino testified appellant was in his custody for about five
hours before he obtained his written statement. He did not know whether appellant
had eaten anything prior to giving the statement. However, Nino stated that had
appellant asked for food, they would have given him some. When counsel asked
Nino if, when he obtained appellant's written statement, he had any knowledge of
appellant's educational background, he replied, "He [appellant] advised he had been,
I believe in Harlingen at TSTI . . . or technical school . . . ."

Appellant's Testimony


 With regard to when appellant requested court-appointed counsel, defense
counsel asked appellant the following questions:

 Q. [Do] you remember the first time you asked for a court appointed
lawyer?


 A. Yes, sir.


 Q. When was that?


 A. It was the first week in county before I was even arraigned. They
came and talked to me if I was wanting a lawyer about [sic] because
they had me charged with evading arrest and I was--they were asking
me if I needed a lawyer and I told them yes.


 Q. [W]hen you say "they" who were you talking about?


 A. I think his name is Lino Rios.[ (6)] He's from the court appointed
lawyer's office.


 Q. This was before you were charged with murder?


 A. Yes, sir.


 Q. And you weren't given a court appointed lawyer then?


 A. No, sir.


 Q. [W]hen was the next time you had asked for a court appointed
lawyer?


 A. When I was arraigned for the murder charge.


 * * *


 Q. [W]hen the officers came to interview you with [sic] a written
statement and the videotaped statement, you remember when this [sic]
asked be [sic] whether you want a lawyer at that time?


 A. Yes, sir.


 Q. You told them no?


 A. Yes, sir.


 Appellant also testified that during the interviews, he was taking three
medications-Risperdal, Remeron, and Clozapine. He said the medicines were for
insomnia and recurring blackouts. He stated he did have trouble sleeping and that
he took his medication the morning of the videotaped interview. However, he did not
take his medication before he gave his written statement.

 On cross-examination, appellant testified that he requested an attorney after
he was arrested for evading arrest. He stated that he was not mistreated and that he
was allowed to use the restroom and drink water.

 After both sides rested, the trial court heard arguments and then denied the
motion to suppress.

Issue One


 By his first issue, Hill complains that the trial court erred by denying the motion to
suppress his statements. He asserts that he requested an attorney after he was arrested
for evading arrest, but before he was interrogated by the police. He claims that the failure
to appoint an attorney is a fundamental violation of the Fifth, Sixth, and Fourteenth
Amendments to the United States Constitution, thus making his statements involuntary. 
See U.S. Const. amends. V, VI, and XIV.

Standard of Review


 In Delao v. State, 235 S.W.3d 235 (Tex. Crim. App. 2007), the court stated the
following standard for reviewing a trial court's decision to admit or exclude a defendant's
confession:

 We have held that the trial court is the "sole and exclusive trier of fact
and judge of the credibility of the witnesses" and the evidence presented at
a hearing on a motion to suppress, particularly where the motion is based on
the voluntariness of a confession. Additionally, given this vital role, great
deference is accorded to the trial court's decision to admit or exclude such
evidence, which will be overturned on appeal only where a flagrant abuse of
discretion is shown. In this case, therefore, we will not disturb the
determination of the court of appeals that the trial court did not abuse its
discretion by admitting Appellant's confession, provided that the court of
appeals properly applied the appropriate standard in arriving at this result.


Id. at 238-39 (citations omitted).

 At a suppression hearing, we give almost total deference to the trial court's
determination of historical facts when supported by the record, particularly if the findings
turn on witness credibility and demeanor. State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim.
App. 2000); Carmouche v. State, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000); Guzman
v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The same deference is accorded to
determinations of mixed questions of law and fact if their resolution depends upon witness
credibility and demeanor. Ross, 32 S.W.3d at 856. Issues that present purely legal
questions are considered under a de novo standard. Id. We will sustain the trial court's
ruling if it is reasonably supported by the record and is correct on any theory of law
applicable to the case. Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

 The Due Process Clause of the United States Constitution requires courts to admit
only voluntary confessions into evidence. Michigan v. Harvey, 494 U.S. 344, 350 (1990). 
Thus, a Fourteenth Amendment violation occurs when a conviction is based, either in
whole or in part, on an involuntary statement. Jackson v. Denno, 378 U.S. 368, 376
(1964).

 
Sixth Amendment Right to Counsel


 The Sixth Amendment provides that "'[i]n all criminal prosecutions, the accused shall
enjoy the right . . . to have the Assistance of Counsel for his defense.'" McNeil v.
Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 2207 (1990). Once this right to counsel has
attached, and the accused has invoked this right, any subsequent waiver during a police-initiated custodial interview is ineffective. Id.; (citing Michigan v. Jackson, 475 U.S. 625
(1986)). 

 The Sixth Amendment right to counsel, however, is offense specific. Id. In other
words, a person cannot invoke this right once for all future prosecutions, "for it does not
attach until a prosecution is commenced, that is, 'at or after the initiation of adversary
judicial criminal proceedings--whether by way of formal charge, preliminary hearing,
indictment, information, or arraignment.'" Id.; (quoting United States v. Gouveia, 467 U.S.
180, 188 (1984)) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)) (plurality opinion). 
And just as the Sixth Amendment right is offense specific, so also its Michigan v. Jackson
effect of invalidating subsequent waivers in police-initiated interrogations is offense
specific. Id. The McNeil Court explained this principle as follows:

 "The police have an interest . . . in investigating new or additional crimes 
[after an individual is formally charged with one crime.] . . . [T]o exclude
evidence pertaining to charges as to which the Sixth Amendment right to
counsel had not attached at the time the evidence was obtained, simply
because other charges were pending at that time, would unnecessarily
frustrate the public's interest in the investigation of criminal activities . . . ."


 "Incriminating statements pertaining to other crimes, as to which the Sixth
Amendment right has not yet attached, are, of course, admissible at a trial
of those offenses."


Id. at 2207-08 (citations omitted).

 Here, at the time appellant provided the inculpatory statements to Ramos and Nino,
his Sixth Amendment right had attached, and he had invoked it only with respect to the
evading-arrest charge. The Sixth Amendment right had not attached to Huddleston's
murder, because "adversary judicial criminal proceedings--whether by way of formal
charge, preliminary hearing, indictment, information, or arraignment" had not yet
commenced with respect to the murder. See McNeil, 111 S.Ct. at 2207. Because
appellant provided the inculpatory statements before the Sixth Amendment right to counsel
attached to the murder and before he invoke this right with respect to the murder, the right
does not bar the admission of the statements in this case. See id. 



 Fifth Amendment Right to Counsel 


 Next, we consider whether appellant's request for a court-appointed lawyer on the
evading-arrest charge also constituted a Fifth Amendment assertion of the right to counsel
such that it was improper for officers to question him about Huddleston's disappearance
and murder. The Fifth Amendment states that "'[n]o person . . . shall be compelled in any
criminal case to be a witness against himself.'" McNeil, 111 S.Ct. at 2208. The Fifth
Amendment right to counsel provides "prophylactic rights designed to counteract the
'inherently compelling pressures' of custodial interrogation, including the right to have
counsel present" Id. (citing Miranda v. Arizona, 384 U.S. 436 (1966)). A suspect may
waive the Fifth Amendment right to counsel; however, "[o]nce a suspect asserts the right,
not only must the current interrogation cease, but he may not be approached for further
interrogation 'until counsel has been made available to him.'" Id. (citing Edwards v.
Arizona, 451 U.S. 477 (1981)). If the police do subsequently initiate an encounter with a
suspect in the absence of counsel (assuming no break in custody has occurred), the
suspect's statements are presumed involuntary and therefor inadmissible as substantive
evidence at trial, even when the suspect executes a waiver and his statements would be
considered voluntary under traditional standards. Id. This rule, called the "Edwards rule,"
is not offense specific: "Once a suspect invokes the Miranda right to counsel for
interrogation regarding one offense, he may not be reapproached regarding any offense
unless counsel is present." Id. (citing Arizona v. Roberson, 486 U.S. 675 (1988))
(emphasis in original).

 The McNeil Court stated that "To invoke the Sixth Amendment interest is as a matter
of fact, not to invoke the Miranda-Edwards interest." Id. The rule of Edwards "applies only
when the suspect 'ha[s] expressed' his wish for the particular sort of lawyerly assistance
that is the subject of Miranda." Id. (citing Edwards, 451 U.S. at 484) (emphasis in original). 
"It requires, at a minimum, some statement that can reasonably be construed to be an
expression of a desire for the assistance of an attorney in dealing with custodial
interrogation by the police. Requesting the assistance of an attorney at a bail hearing does
not bear that construction." Id. (emphasis in original). In McNeil, the court went on to hold
that invocation of the offense-specific Sixth Amendment right to counsel at a bail hearing
did not, by itself, invoke the non-offense specific Fifth Amendment right to counsel. Id. In
doing so, the McNeil Court quoted the Washington Supreme Court as follows: "'[T]o find
that [the defendant] invoked his Fifth Amendment right to counsel on the present charges
merely by requesting the appointment of counsel at his arraignment on the unrelated
charge is to disregard the ordinary meaning of that request.'" Id. (quoting State v. Stewart,
113 Wash.2d 462, 780 P.2d 844, 849 (1989)).

 Similarly, in Green v. State, 934 S.W.2d 92 (Tex. Crim. App. 1996), Green was
charged with aggravated robbery unrelated to a murder. Subsequently, he was taken to
a magistrate who appointed a lawyer to represent him on the aggravated robbery.
Afterwards, he was taken to the police station for questioning about a murder. His court-appointed attorney in the robbery case was not informed of this questioning. Green waived
his statutory warnings and gave an incriminating statement to police about the murder. 
The trial court denied his motion to suppress this statement. On appeal, Green argued that
admission of his statement violated his Fifth and Sixth Amendment rights to counsel. He
claimed these rights were invoked when he requested a lawyer at his appearance before
the magistrate with respect to his aggravated-robbery charge and that the absence of his
appointed lawyer at the interrogation about the murder violated both his Fifth and Sixth
Amendment rights.

 With regard to his Fifth Amendment right to counsel, the Green court, relying on
McNeil, stated: 

 [Green] does not claim, nor does the record demonstrate, that [he] was
subjected to custodial interrogation when he appeared before the magistrate
and was appointed counsel in connection with the robbery. Like the hearing
in McNeil, [Green's] request for an attorney at his appearance associated
with the robbery was not an expression for assistance in dealing with
custodial interrogation by the police. Furthermore, at no time did [he] request
the assistance of counsel in response to police questioning of him
concerning his statement. We find appellant failed to invoke his Fifth
Amendment right to counsel.


Id. at 97 (citing McNeil, 111 S.Ct. at 2209); see Dinkins v. State, 894 S.W.2d 330, 351
(Tex. Crim. App. 1995) (holding Fifth Amendment right to counsel "is considered invoked
[when] a person indicates he or she desires to speak to an attorney or have an attorney
present during questioning").

 With regard to application of the Sixth Amendment right to counsel, the Green court
stated:

 It is undisputed that when [Green] was charged with aggravated robbery, his
Sixth Amendment right to counsel attached and was invoked with respect to
that offense. [His] invocation of his Sixth Amendment right to counsel in
connection with the robbery charge, however, does not impact on [his] Sixth
Amendment right relating to the murder. In McNeil, the Supreme Court held
that the rule in Roberson, which extends the invocation of the Fifth
Amendment right to counsel from one crime to another, does not apply to the
Sixth Amendment right to counsel. McNeil, 501 U.S. at 181, 111 S.Ct. at
2210. The Court reasoned that because the Sixth Amendment is offense-specific "[i]t cannot be invoked once for all future prosecutions, for it does not
attach until a prosecution is commenced, . . . ." Id. at 175, 111 S.Ct. at 2207. 
Therefore, [Green's] invocation of his Sixth Amendment right to counsel with
respect to the robbery offense did not extend to the murder offense. [He]
concedes that he had not been charged with murder when the police
questioned him about that crime. It is important to note that [he] was only
being questioned and that the inquiry was restricted to questions about the
murder. Because the Sixth Amendment right to counsel attaches only after
adversary judicial proceedings are initiated, and [Green] had not been
charged with the murder at the time he claims his Sixth Amendment right to
counsel arose, his argument must fail.


Id. at 97-98.

 The situation faced by the Green court was similar to the situation now before us. 
Although appellant requested court-appointed counsel on the evading-arrest charge, the
record does not show he expressed a desire for the assistance of an attorney in dealing
with custodial interrogation. (7) Furthermore, appellant never requested assistance of
counsel in response to police questioning, and he consistently waived his right to remain
silent and his right to obtain the assistance of counsel in regard to the custodial
interrogation. See id. at 97 (noting that at no time did suspect request the assistance of
counsel in response to police questioning). We find that the record supports the
conclusion that appellant invoked only his Sixth Amendment right to counsel with respect
to the evading-arrest charge; thus, his statements regarding Huddleston's disappearance
and murder were not inadmissible as violative of his constitutional rights.

Medical Impairments


 By this same issue, appellant asserts he was under psychiatric care and under
medication which would cause him to be incapable of understanding the consequences
of his statements to the police, thus making the statements involuntary. Article 38.21 of
the Texas Code of Criminal Procedure provides that an accused's statements "may be
used in evidence against him if it appears that the same w[ere] freely and voluntarily made
without compulsion or persuasion, . . . ." Tex. Code Crim. Proc. Ann. art. 38.21 (Vernon
2005). 

 In Delao, the court of criminal appeals held "that the totality of the circumstances
standard for assessing the voluntariness of a confession given by a person of normal
mentality is also the appropriate standard to apply when a confession is made by someone
suffering from mental retardation and mental illness." Id. at 241. (8) An accused's mentality
is but one factor among many to consider when evaluating the voluntariness of a
confession. Id. at 240. (9) To render a confession involuntary, a defendant's "mental
impairment" must be "so severe that he is incapable of understanding the meaning and
effect of his confession." Green v. State, 839 S.W.2d 935, 940 (Tex. App.-Waco 1992,
pet. ref'd) (citing Casias v. State, 452 S.W.2d 483, 488 (Tex. Crim. App. 1970).

 Analysis


 Prior to conducting the oral interview and obtaining the written and videotaped
statements, either Ramos or Nino gave appellant his Miranda warnings. Their testimony
showed appellant understood the warnings and that he agreed to waive his rights and give
the statements.

 During the three interviews, appellant responded to the questions asked by Ramos
and Nino, and they testified appellant understood the questions. The transcript of the
videotaped statement reflects appellant answered the questions and that his responses
addressed each question. See Guardiola v. State, 20 S.W.3d 216, 224 (Tex.
App.-Houston [14th Dist.] 2000, pet ref'd).

 Appellant maintained that when he was with Huddleston, he blacked out and that
when he woke up, she was dead. This contention signifies appellant's "ability to think
defensively and to offer a mitigating statement." Furthermore, this contention indicates
appellant's awareness that confessing may lead to criminal prosecution. In fact, appellant
acknowledged his understanding that anything he said could be used against him in court.


Coerciveness of the Interviews


 Texas law considers an accused's statement involuntary if there is "official, coercive
conduct" such that "any statement obtained thereby was unlikely to have been the product
of an essentially free and unconstrained choice by its maker." Alvarado v. State, 912
S.W.2d 199, 211 (Tex. Crim. App. 1995). Factors to consider when determining whether
a defendant's confession was coerced include: "length of detention; incommunicado or
prolonged interrogation; denying access to a family member; refusing a defendant's
request to telephone a lawyer or family member; and physical brutality." Pace v. State, 986
S.W.2d 740, 747 (Tex. App.-El Paso 1999, pet. ref'd). Here, the interviews lacked any
element of coerciveness: (1) the interviews were not unduly lengthy; (2) there is no
evidence of physical brutality-appellant was neither injured prior to or during the interviews,
and no one threatened him with injury; (3) appellant was not denied sleep, medicine, food,
water, or the use of the restroom; (4) even though appellant had been in jail since May 26,
2003, the record does not show that his confinement overcame his will, causing him to
confess; (5) the record does not show appellant's anxiety level was increased by being
confined to a small interview room with Ramos and Nino, both of whom were authority
figures; and (6) the record does not show that appellant asked to either speak to or
telephone a lawyer prior to speaking to either Ramos or Nino. Consequently, the record
lacks evidence of "official, coercive conduct" such that "any statement[s] obtained thereby
[were] unlikely to have been the product of an essentially free and unconstrained choice
by its maker." Alvarado, 912 S.W.2d at 211.
Right to Terminate the Interviews


 "[F]ailure to cut off questioning after a suspect invokes his right to remain silent
violates his rights and renders any subsequently obtained statements inadmissible." 
Dowthitt v. State, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). However, "an officer need
not stop his questioning unless the suspect's invocation of rights is unambiguous, and the
officer is not required to clarify ambiguous remarks." Id. Prior to conducting the interviews,
either Ramos or Nino explained to appellant his right to terminate the interviews. Appellant
responded that he understood this right each time Ramos or Nino advised him of it. 
Appellant has failed to identify, and we are unable to find, any statement unambiguously
attempting to terminate the interviews and invoke his right to remain silent. See Dowthitt,
931 S.W.2d at 257.

Totality of the Circumstances


 Even though appellant suffered from insomnia and recurring blackouts for which he
took three medications, the totality of the circumstances does not indicate that his mental
impairments were of such great severity that he was "incapable of understanding the
meaning and effect of his confession[s]." Green, 839 S.W.2d at 940. Rather, he
consented to the questioning, was advised of his Miranda rights, and he indicated that he
understood these rights. He was able to provide answers to the questions posed,
formulate a defensive response, and express his awareness that the confessions would
be used against him. Furthermore, he was not subjected to a coercive environment. The
interviews were relatively short in duration, appellant received a drink of water, and he
suffered no physical violence during any interview. Thus, the record indicates that
appellant's will was not overborne and that his confessions were "freely and voluntarily
made without compulsion or persuasion." See Tex. Code Crim. Proc. Ann. art. 38.21
(Vernon 2005). Furthermore, appellant did not assert his right to terminate the interviews. 
Accordingly, under the totality of the circumstances, we hold the trial court did not abuse
its discretion by denying the motion to suppress. (10) The first issue is overruled.

II. Motion to Transfer Venue


 In issue two, appellant argues the trial court erred in failing to grant him a
requested change of venue. Appellant filed an amended motion for a change of
venue. (11) Attached were three affidavits-one from appellant, and one each from
Georginna Gutierrez and Claudia Farias, both of whom stated they were Hidalgo
County residents. In his affidavit, appellant stated, "One of the local newspaper
articles addressed the issue that I had murdered my grandmother when I was young
and had served prison time for that offense." He asserted that "Based on the
information provided in The Monitor newspaper and local T.V. stations, I cannot
obtain a fair and impartial trial in Hidalgo County."

 In their affidavits, Gutierrez and Farias stated they had read five newspaper
articles in the McAllen Monitor regarding appellant's murder case. They stated that
"This cause of action has received extensive media coverage and/or high publicity. 
Due to extensive media coverage, a dangerous combination against Defendant has
already been instigated by influential persons in that a fair and impartial trial cannot
be obtained."

 At the hearing on the motion, defense counsel introduced into evidence five
news articles which were published in the McAllen Monitor. (12) Counsel advised the trial
court that, in addition to the articles, "There's information, also, we believe, that went to the
citizens of this county through the TV stations, and I think there's a TV station here today
covering this hearing."

 During the hearing, the State introduced three controverting affidavits into evidence. 
The affiants, all of whom were Hidalgo County residents, stated they had read the affidavits
provided by appellant and that "Affiant believes that there is not sufficient prejudice in
Hidalgo County to warrant a transfer of venue, and the Defendant would be able to obtain
a fair trial in Hidalgo County."

Applicable Law


 Article 31.03(a) of the Texas Code of Criminal Procedure provides, in relevant part,
that a trial court may grant a change of venue if the defendant establishes that "there exists
in the county where the prosecution is commenced so great a prejudice against him that
he cannot obtain a fair and impartial trial." Tex. Code Crim. Proc. Ann. art. 31.03(a)
(Vernon 2006). The standard of review on appeal from a trial court's ruling on a motion for
change of venue is abuse of discretion. Gonzalez v. State, 222 S.W.3d 446, 449 (Tex.
Crim. App. 2007). If the trial court's ruling concerning a motion for a change of venue falls
within the zone of reasonable disagreement, it will be upheld. See Id.; See also Narvaiz
v. State, 840 S.W.2d 415, 428 (Tex. Crim. App. 1992).

 In Gonzalez, the court stated the precepts for determining when a change of venue
based upon media attention is justified:

 To justify a change of venue based upon media attention, a defendant must
show that the publicity was pervasive, prejudicial, and inflammatory. 
Widespread publicity by itself is not considered inherently prejudicial. 
Indeed, even extensive knowledge of the case or defendant in the
community as a result of pretrial publicity is not sufficient if there is not also
some showing of prejudicial or inflammatory coverage. The mere existence
of media attention or publicity is not enough, by itself, to merit a change of
venue.


Id. at 449 (citations omitted).

Analysis


A. Pervasiveness of the Publicity

 The two primary means of discerning whether publicity is pervasive are a hearing
on the motion to change venue and the voir dire process. (13) Id. At the hearing, appellant
presented three affidavits regarding the amount of publicity his case had generated and
the effect of that publicity on the community. He also introduced into evidence five
newspaper articles. However, he presented no evidence concerning how many people
saw the newspaper coverage of his case. (14) See id. at 450.

 With regard to the voir dire process, Gutierrez and Farias stated in their affidavits
that: "Based on the information provided in The Monitor newspaper, I could not be a fair
and impartial juror on this case . . . ." However, the fact that two persons who could not be
fair and impartial jurors in this case does not establish that the pretrial publicity permeated
the community to the extent that the decision to deny the motion for a change of venue
was outside the zone of reasonable disagreement. (15) While the lack of pervasiveness alone
would be enough to sustain the trial court's ruling, we will also examine the question of
whether the publicity was inflammatory and prejudicial.

B. Prejudicial and Inflammatory Character of the Publicity


 In examining whether the pretrial publicity is prejudicial and inflammatory, a trial
court may take three matters into consideration: (1) the nature of the publicity; (2) any
evidence presented at a change of venue hearing; and (3) testimony received from venire
members at voir dire. Gonzalez, 222 S.W.3d at 451. News stories, be it from print, radio,
or television, that are accurate and objective in their coverage, are generally considered
by the court of criminal appeals not to be prejudicial or inflammatory. Id.; Bell v. State, 938
S.W.2d 35, 46 (Tex. Crim. App. 1996).

 Here, the affidavits provided by appellant point to the publication of the five
newspaper articles, as well as the television coverage, as the causes of the alleged
prejudice in this case. Over the last forty years, the court of criminal appeals has been
reluctant to hold that pretrial publicity in a case was so prejudicial and inflammatory that
the trial court's decision to deny a change of venue was outside the zone of reasonable
disagreement. Gonzalez, 222 S.W.3d at 451. Only on two occasions has the court of
criminal appeals found that a trial court abused its discretion in connection with denying a
motion to change venue based upon pretrial publicity. See id.; see also Henley v. State,
576 S.W.2d 66 (Tex. Crim. App. 1978); Rubinstein v. State, 407 S.W.2d 793 (Tex. Crim.
App. 1966). Henley involved a trial court's failure to either hold a hearing or allow the
introduction of evidence on pretrial publicity. Henley, 576 S.W.2d at 72. Therefor, Henley
is not instructive on the issue in this case.

 In Rubenstein, the defendant was indicted for Lee Harvey Oswald's murder. 
Rubenstein, 407 S.W.2d at 794. Countless thousands of people watched televised
coverage of Rubenstein shooting Oswald. Id. Local news stories stated "directly,
indirectly, by hints and innuendoes that a Communist conspiracy existed between Oswald
and Ruby." Id. at 796 (McDonald, J. concurring). Rubenstein was referred to as a "tough
guy" or "Chicago mobster" in the press. Id.

 Rubenstein filed a pretrial motion for change of venue, which was denied. Id. at
794. His conviction was overturned on appeal on other grounds, but the court of criminal
appeals also held that the trial court erred in denying the change of venue. Id. at 795. In
a concurring opinion, Judge McDonald described the publicity surrounding Rubenstein's
case as "a background of unusual and extraordinary invasions of the expected neutral
mental processes of a citizenry," which contributed to the court's reasoning that the trial
court abused its discretion in denying a change of venue. Id. at 796 (McDonald, J.
concurring).

 The facts in the present case are readily distinguishable from those in Rubenstein. 
Huddleston's murder did not generate the media coverage which followed Oswald's
murder. The news coverage was limited to television broadcasts and five news articles in
the local paper. The newspaper articles provided information about appellant's criminal
history, his confession to the police, the circumstances leading up to Huddleston's murder,
and the recovery of her body. Unlike the situation in Rubenstein, the articles did not
describe appellant in a demeaning fashion; rather, they portrayed an accurate, objective
rendition of the events surrounding Huddleston's murder. Furthermore, no one saw a
videotape of appellant murdering Huddleston. Thus, the news coverage did not constitute
either inflammatory or prejudicial publicity. Cf. Gonzalez, 222 S.W.3d at 451-52. 
Accordingly, the trial court's decision to deny the motion to transfer venue is within the
zone of reasonable disagreement. Therefore, we hold that the trial court did not abuse its
discretion by denying the motion to transfer venue. The second issue is overruled.

III. Conclusion

 The trial court's judgment is affirmed.


 

 ROSE VELA

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and 

filed this 13th day of December, 2007.
1. The trial court signed a document entitled "TRIAL COURT'S CERTIFICATION OF DEFENDANT"S
RIGHT TO APPEAL." On this document, a check mark appears in the space which corresponds to the
statement "is not in a plea-bargain case, and the defendant has the right of appeal."
2. Appellant gave police an oral statement, a written statement, and a videotaped statement. He filed
a motion to suppress these statements asserting, in relevant part: (1) his statements were involuntary,
coerced, and enticed; and (2) he was denied his right to counsel and did not make an intelligent, knowing
waiver of that right.
3. On August 8, 2003, appellant signed a document in which he requested a court-appointed attorney. 
On August 11, 2003, an attorney was appointed for him.
4. The statement was admitted into evidence as State's Exhibit 1.
5. The videotape was admitted into evidence as State's Exhibit 2 and played for the court.
6. Lino Rios did not testify at the suppression hearing.
7. In Green, the suspect's interrogation regarding the murder allegation did not occur until several days
after he requested appointment of counsel on the robbery charge. See 934 S.W.2d at 96.
8. The United States Supreme Court has held that the determination whether a confession was
voluntarily rendered must be analyzed by examining the totality of the circumstances. Arizona v. Fulminante,
499 U.S. 279, 285-86 (1991).
9. See Bizzarri v. State, 492 S.W.2d 944, 946 (Tex. Crim. App. 1973) (stating that while evidence
demonstrating an individual's diminished mentality would have some bearing on whether her
confession is admissible, it is merely a "fact . . . to be considered," but is not conclusive of
involuntariness); See also Dollgener v. State, No. 10-01-363-CR, 2003 Tex. App. LEXIS 5163 at *1 (Tex.
App.-Waco June 18, 2003, pet. ref'd) (not designated for publication) (declaring that "[e]vidence of
mental retardation and mental impairment is a factor to be considered by the court in determining from
the totality of the circumstances whether the accused voluntarily and knowingly waived his rights prior
to confessing"); Harner v. State, 997 S.W.2d 695, 699 (Tex. App.-Texarkana 1999, no pet.); Weatherford
v. State, No. 12-00-00329-CR, 2002 WL 59336, at *5 (Tex. App.-Tyler Jan. 9, 2002, no pet.) (not
designated for publication).
10. Texas courts have upheld confessions made by defendants suffering from mental impairments far
worse than those suffered by appellant. See Harner v. State, 997 S.W.2d 695, 700 (Tex. App.-Texarkana
1999, no pet.) (defendant had an eighth-grade education, attended special-education classes, was an MHMR
patient, took medication, and was told he could return to MHMR if he signed his confession); see also Casias
v. State, 452 S.W.2d 483, 488 (Tex. Crim. App. 1970) (defendant had a 68 I.Q., was retarded, illiterate, at the
mental age of eight to ten, and at the educational level of "approximately second grade"); Bell v. State, 582
S.W.2d 800, 809 (Tex. Crim. App. 1979) (defendant was mildly mentally retarded and "lacked the capacity
to read and understand certain statements"); Grayson v. State, 438 S.W.2d 553, 555-56 (Tex. Crim.
App.1969) (defendant was "not nearly as intelligent as a normal three or four year old," and had a 51 I.Q.).
11. The State filed an answer controverting the request for a change of venue.
12. The article of October 29, 2003 stated, in relevant part, "A 31-year-old McAllen man accused of
choking his ex-girlfriend to death and stuffing her body in a suitcase pleaded innocent Tuesday to murder
charges. Jeffrey Ryan Hill's plea came two weeks after he first was brought before 139th state District Court
Judge Leticia Hinojosa . . . . Hill is charged with strangling Virginia Pascalin Huddleston, 34, after she made
negative remarks about Hill's current wife, . . . . Huddleston's severely decomposed body was found June
3 in a suitcase off a rural road near Los Fresnos. Hill confessed to the killing shortly before showing police
where Huddleston's body was located, . . . . Hill was charged in the 1984 shooting death of his grandmother. 
According to court records, Hill shot his grandmother in the head with a shotgun in order to take her car. He
spent time in Texas Youth Commission facilities until he was released on his 18th birthday."


 An article dated June 6, 2003 stated, in relevant part, "Jeffrey Ryan Hill, 31, confessed to police
regarding the death of Virginia Pascalin Huddleston, 34, after she made negative comments about Hill's
current wife. Huddleston's body was found severely decomposed Tuesday night by McAllen police officers
inside a suitcase by the side of a San Benito rural road. Her body, inside the suitcase, was in the brush thicket
for eight days, . . . . A convicted felon currently on parole, Hill's bail was set at $250,000." The article further
stated, "On May 27, Jeffrey Hill told [his wife] that he killed the woman" and "'In that last interview he led us
to the body,' the police chief said. Hill told police he choked Huddleston in her apartment . . . . He put the
body in a suitcase and drove to Iowa Garden Road, east of U.S. Highway 77, in San Benito to dump the body,
. . . . When the crime was committed, Hill was on parole from the Texas Department of Criminal Justice . .
. . He was in state prison from 1985 to July 2001 for two burglaries [sic] of habitation charges and a forgery
offense, . . . ."


 An article dated October 30, 2003 stated, in relevant part, "After returning from a court appearance
Tuesday, murder suspect Jeffrey Ryan Hill attempted to start a fire in his cell at the Hidalgo County Jail. Hill,
31, was in the 139th state District Court on Tuesday to plead innocent to charges that he choked his ex-girlfriend and stuffed her body in a suitcase. When he returned to the jail, he broke a light fixture in his cell,
pulled out two wires to create an arc of electricity and set a letter on fire, . . . . Hill is charged with strangling
Virginia Pascalin Huddleston, 34, . . . after she made negative comments about his current wife, . . . . 
Huddleston's body was found June 3 severely decomposed in a suitcase off a rural road near Los Fresnos. 
Hill confessed to the killing shortly before showing police where Huddleston's body was located, . . . . Hill had
also been charged in the 1984 shooting death of his grandmother, . . . . Hill shot his grandmother in the head
with a shotgun in order to take her car. He spent time in Texas Youth Commission facilities until he was
released on his 18th birthday. . . ."


 The article dated October 22, 2003 stated, in relevant part, "He [appellant] told his wife that his
grandmother died in an accident when he was 12, but never told her he was the one who had intentionally shot
her in the head . . . . In May, he told [his wife] he had beat up his ex-girlfriend, Virginia Huddleston, but waited
half a day to tell her he strangled her to death . . . . Police documents show that [appellant's wife] turned in
her husband to police after he admitted to killing Huddleston. . . . He [appellant] is charged with strangling
Huddleston on May 26, after she made negative remarks about [his wife], . . . . Huddleston's body was found
severely decomposed June 3, in a suitcase off a rural road near Los Fresnos. . . . His [appellant's]
grandmother was killed at 2:30 a.m. Aug. 15, 1984, after being shot in the head with a shotgun. Hill then took
her car, drove 60 miles to his grandfather's house, where he stole some antique coins . . . ."


 The article of October 16, 2003 stated, in relevant part, "This is not the first time Jeffrey Ryan Hill, a
McAllen man accused of killing his ex-girlfriend in May and stuffing her body into a suitcase has been charged
with murder. Hill, 31, was held in [the] Texas Youth Commission for six years after he killed his grandmother,
. . . . He was 12 at the time of the 1984 murder . . . . Police on June 3 found Huddleston's severely
decomposed body inside a suitcase by the side of a San Benito rural road. The suitcase was in the brush
thicket for eight days, police said at the time of the murder . . . . Hill confessed to police that he killed
Huddleston, 34, on May 26 after she made negative comments about Hill's current wife, . . . . Hill was on
parole from the Texas Department of Criminal Justice when Huddleston was killed, . . . . He was in state
prison from 1995 to July 2001 for two burglary of habitation charges and a forgery offense, . . . .


 
13. Because appellant pleaded guilty, there was no voir dire examination.
14. For an example of what form this type of evidence could take, see Mayola v. Alabama, 623 F.2d
992, 998 (5th Cir. 1980); United States v. Ricardo, 619 F.2d 1124, 1131-32 (5th Cir. 1980).
15. The court of criminal appeals and other appellate courts have found trial courts within their discretion
when they seated panels when 69 venire members out of 109 had seen publicity on the accused's case, Von
Byrd v. State, 569 S.W.2d 883, 890-891 (Tex. Crim. App. 1978), when 44 out of 72 had seen publicity on the
defendant's case, Russell v. State, 146 S.W.3d 705, 714 (Tex. App.-Texarkana 2004, pet. ref'd), and when
52 panelists out of 64 had seen something on the defendant's case. Crawford v. State, 685 S.W.2d 343, 349-350 (Tex. App.-Amarillo 1984), rev'd on other grounds, 696 S.W.2d 903 (Tex. Crim. App. 1985). Likewise,
the court of criminal appeals has found trial courts within their discretion when they seated juries when 15
venire members out of 77 stated that they had an opinion that could not be set aside, Gardner v. State, 733
S.W.2d 195, 204-205 (Tex. Crim. App. 1987), and when 39 out of 112 held that same view. Taylor v. State,
420 S.W.2d 601, 604 (Tex. Crim. App. 1967).